STATE OF NEBRASKA V. JOHN E. HILL ET AL.

FILED MARCH 5, 1896. No. 6952.

1. **Action on State Treasurer's Bond:** FAILURE TO TURN
OVER FUNDS. In an action on a treasurer's bond the
breaches especially alleged were, that there had been a
failure to turn over to his successor a certain sum which
it was alleged the outgoing treasurer had in a certain
bank when his term of office expired. By answer it was
alleged that the outgoing treasurer had turned over to his
successor evidence of indebtedness of the same charac-
ter as those which had formed the basis of liability of
the bank to himself to an amount equal to that for
which he was sought to be held. By reply, it was, in
effect, admitted that the outgoing treasurer had turned
over to his successor all choses in action that he had
received as treasurer, in like forms of evidence of in-
debtedness with those which he had received, but it was
averred that such payment was ineffectual to release the
outgoing treasurer because, as insisted by the plaintiff,
nothing but cash could be treated as payment. *Held,*
That, under this condition of the issues, and under
proofs consistent with the theory of each contending
party, it was a question of fact for the jury to determine
how much actual money had been received and paid,
and that its verdict, being founded upon sufficient evi-
dence, must stand. Per RYAN, C. IRVINE and RAGAN,
CC., concur.

2. **Official Bonds:** DELIVERY: PLEADING. Where the petition
alleges the delivery of the official bond declared on, the
allegation in the answer of a surety,—following an aver-
ment therein that he signed upon condition the princi-
pal should also sign,—that "if it [the bond] was ever
delivered, it was done in violation of the express condi-
tion aforesaid upon which defendant signed said instru-
ment," must be treated as a substantial admission of
the delivery of the bond. Per NORVAL, J. All concur-
ring.

3. ——: ——. Whether the sureties in an official bond
are liable where the principal therein named has failed
to sign it before its acceptance and approval, *quære.*
Per NORVAL, J.

State v. Hill.

4. ———: EXECUTION: SIGNATURE OF PRINCIPAL. When a state officer elect writes his name in the body of a paper prepared by himself as his official bond, and subscribes his oath of office indorsed thereon, which instrument is delivered, accepted, and approved as his official bond, the same is valid and binding upon the principal and his sureties, even though such officer inadvertently omitted to attach his final signature at the bottom of the bond. Per NORVAL, J. All concurring.

5. Treasurers: TURNING OVER PUBLIC FUNDS: CERTIFICATES OF DEPOSIT. Prior to the taking effect of the legislative enactment providing for the depositing of state and county funds in bank, the payment of money in the hands of a state or county treasurer, at the termination of his term of office, to his successor, could be effectuated alone by the delivery of that which the law of the land recognized as money. The mere delivery and acceptance of certificates of deposit issued by a bank—upon which no money has been realized—is not such a payment as will release the outgoing officer. *Cedar County v. Jenal*, 14 Neb., 254, adhered to. Per NORVAL, J.

6. ———: ACCEPTANCE OF CERTIFICATES OF DEPOSIT: RATIFICATION BY STATE. Although a state treasurer has no right to receive in payment of the public revenues anything but money, yet if he chooses to do so, the state may ratify the act, in which case he and his sureties are chargeable as for money, and must make good the amount. Per NORVAL, J.

7. ———: ———: ———. The legislature has the power to ratify the act of an outgoing state treasurer in turning over to his successor, as money, certificates of deposit issued by a bank. Per NORVAL, J. HARRISON, J., concurring.

8. ———: ———: ———. *Held*, That the record discloses such a ratification in this case. Per NORVAL, J. HARRISON, J., concurring.

9. Payment: APPLICATION. When partial payments have been made on a running account, the debtor has the right to direct their application, but if he fails to do so the creditor may make the application, and where neither of them has made any appropriation before suit is brought, the law will apply such payments according to their priority of time; that is, the first item on the

debit side is discharged or reduced by the first item on the other side of the account. Per NORVAL, J.

10. New Trial: INSTRUCTIONS: HARMLESS ERROR. A verdict will not be set aside for error in instructions, when it is manifest that no other verdict should have been returned under the evidence. *Western Union Telegraph Co. v. Lowrey*, 32 Neb., 732, followed. Per NORVAL, J. All concurring.

11. Embezzlement. It is essential to the crime of embezzlement that the owner be deprived of the property alleged to have been embezzled, by an adverse use or holding. (*Chaplin v. Lee*, 18 Neb., 440.) Per POST, C. J. All concur.

12. ———: OFFICERS: LOANING PUBLIC MONEY. So much of section 124, Criminal Code, 1873, defining embezzlement of public funds, as provides that if any officer charged with the collection, safe-keeping, or disbursement of public funds "shall loan, with or without interest, * * * any portion of the public money, * * * every such act shall be deemed * * * an embezzlement of so much of the said moneys * * * as shall be thus * * * loaned" (General Statutes, 1873, p. 749, sec. 124), was intended to prevent the unlawful use by officers, and others with their knowledge and consent, of money committed to their custody, and not as an amendment of existing statutes regulating the means of preserving and accounting for of public funds. Per POST, C. J. HARRISON, J., RYAN, RAGAN, and IRVINE, CC., concurring.

13. ———: ———: DEPOSITS OF PUBLIC FUNDS: LOANS. The term "loan" is thus employed in a restricted sense, and includes those transactions only in which the conventional relation of borrower and lender exists, and has no application to the deposit in bank, for safe-keeping, of public funds by the custodian thereof who so far retains his control over them that they may be by him at any time reclaimed. Per POST, C. J. RYAN and RAGAN, CC., concurring.

14. Commercial Paper: PUBLIC FUNDS: OFFICERS. In the absence of statutory restriction upon the subject, the method employed in the monetary transactions of the world by which payments are made, and charges and credits adjusted, through the agency of checks, drafts,

and certificates of deposit, is so far applicable to custodians of public funds in this state as to render them liable for remittances by that means made and received, provided such instruments be in good faith tendered and accepted as payment and not for collection and credit at the debtor's risk. Per POST, C. J. RYAN, RAGAN, and IRVINE, CC., concurring.

15. **Definition of "Money."** The word "money" is a generic term, and may include not only legal tender coin and currency, but any other circulating medium, instruments, or tokens in general use in the commercial world as the representative of value. (*State v. McFetridge*, 84 Wis., 473.) Per POST, C. J. RYAN, RAGAN, and IRVINE, CC., concurring.

16. **State Treasurer: TURNING OVER FUNDS: PAYMENT: ACCEPTANCE OF CHECKS.** A state treasurer who on taking charge of the office, instead of demanding the funds due from his predecessor in cash, accepts in payment thereof certificates of deposit issued by a bank in which such funds have been deposited for safe-keeping, is chargeable upon his bond for the amount of such payment and his liability therefor is not affected by the fact that he is unable to realize the money upon such certificates by reason of the subsequent failure of said bank. Per POST, C. J. HARRISON, J., RYAN, RAGAN, and IRVINE, CC., concurring.

17. ———: ———: ———: ———: SETTLEMENT. Such a transaction, if in good faith by both parties, amounts to a settlement within the meaning of the statute, which will, to the extent of the payment so made, relieve the retiring treasurer, since the state is not entitled to concurrent remedies upon the bonds of successive officers to enforce the same liability, and whatever is in such case sufficient in law to charge the incumbent will operate *per se* to discharge his predecessor. Per POST, C. J. RYAN and RAGAN, CC., concurring.

18. **Stare Decisis.** Where a line of decisions, although erroneous, has become a rule of property it should be adhered to until changed by statute; but in the absence of complications resulting from property rights it is the undoubted privilege, if not indeed the duty, of courts to re-examine questions, and modify or overrule previous decisions shown to be fundamentally wrong. Per POST, C. J. All concur.

19. ———: LIABILITY OF TREASURERS. *State v. Keim*, 8 Neb., 63, *First Nat. Bank of South Bend, Ind., v. Gandy*, 11 Neb., 431, and *Cedar County v. Jenal*, 14 Neb., 254, criticised. *State v. Hill*, 38 Neb., 698, distinguished.

20. Liability of Treasurers: CERTIFICATES OF DEPOSIT. Whether the doctrine of *Cedar County v. Jenal*, 14 Neb., 254, extends to a case where a treasurer has accepted certificates of deposit from his predecessor, doubted. Per IRVINE, C.

21. ———: DEPOSITORY LAW: NOVATION. The deposit by Hill's successor, under the depository law, of the certificates received by him from Hill, in the same bank which issued them, the cancellation of the certificates and the state's accepting a credit on open account for their amount operated a novation, made the bank the state's debtor, and released Hill from liability. Per IRVINE, C. HARRISON, J., and RYAN and RAGAN, CC., concur.

ORIGINAL action in the supreme court to recover from defendants upon the official bond of John E. Hill for his second term as state treasurer, the sum of $236,364.62. There was a trial to a jury, resulting in a verdict for defendants. Heard on motion of the state for a new trial and on motion of defendants for judgment on the verdict. *New trial denied and judgment entered in favor of defendants.*

Omitting the justifications of the sureties, the bond upon which the action is based and the oath of office attached thereto are as follows, the italicized words in the bond being in the handwriting of John E. Hill, whose signature does not appear at the end of the instrument:

"Know all men by these presents, that we, *John E. Hill*, as principal, and Charles W. Mosher, D. E. Thompson, J. D. Macfarland, Richard C. Outcalt, John Fitzgerald, J. E. Smith, S. C. Smith, John Ellis, C. T. Boggs, N. S. Harwood, Frank

Colpetzer, V. B. Caldwell, Saml. E. Rogers, John F. Coad, as sureties, are held and firmly bound unto the state of Nebraska in the sum of *two million* dollars, for the payment of which, well and truly to be made unto the state of Nebraska, we bind ourselves, our heirs, executors, and administrators jointly and severally by these presents; sealed with our seals and dated this —— day of December, A. D. 1890.

"The conditions of this bond are these: Whereas, at the last general election held within and for the state of Nebraska, the above bounden *John E. Hill* was duly elected to the office of *treasurer of the state of Nebraska* for the term of two years from the 8th day of January, A. D. 1891:

"Now, if the said *John E. Hill* shall well and truly, in all things, perform the duties of *treasurer of the state of Nebraska* for the state of Nebraska during the continuance of his term of office, as provided by law, then the above obligation to be void, otherwise to be and remain in full force and effect.

| | |
|---|---:|
| "Charles W. Mosher | $300,000 00 |
| "D. E. Thompson | 150,000 00 |
| "J. D. Macfarland | 200,000 00 |
| "Richd. C. Outcalt | 150,000 00 |
| "John Fitzgerald | 400,000 00 |
| "J. E. Smith | 100,000 00 |
| "S. C. Smith | 100,000 00 |
| "John Ellis | 100,000 00 |
| "C. T. Boggs | 100,000 00 |
| "N. S. Harwood | 100,000 00 |
| "Frank Colpetzer | 100,000 00 |
| "V. B. Caldwell | 100,000 00 |
| "Saml. E. Rogers | 200,000 00 |
| "John F. Coad | 200,000 00 |
| "John H. McClay | 50,000 00 |
| "John B. Wright | 50,000 00 |

"STATE OF NEBRASKA, ⎱
  COUNTY OF LANCASTER. ⎰

"I do solemnly swear that I will support the constitution of the United States and the constitution of the state of Nebraska, and will faithfully discharge the duties of state treasurer of the state of Nebraska according to law, and the best of my ability; and that at the election at which I was chosen to fill said office I did not improperly influence in any way the vote of any elector, and have not accepted, nor will I accept or receive, directly or indirectly, any money or other valuable thing from any corporation, company, or person, or any promise of office for any official act or influence.          JOHN E. HILL.

"Subscribed in my presence and sworn to before me this 8th day of January, A. D. 1891.

"AMASA COBB,
  *"Chief Justice."*

[Indorsed:] "Official Bond. J. E. Hill, State Treasurer. Approved this 8th day of January, A. D., 1891. James E. Boyd, Governor of Nebraska. Approved this 8th day of January, A. D. 1891. John M. Thayer, Governor."

"STATE OF NEBRASKA, ⎱ SS.
  SECRETARY'S OFFICE. ⎰

"Received and filed for record this 8th day of January, A. D. 1891, and recorded in Book "C," Bond Record Incorporations, at page 283.

"JOHN C. ALLEN,
  *"Secretary of State."*

See opinions by RYAN, C., and NORVAL, J., for statement of the case.

The court instructed the jury as follows:

"1. By this action the state of Nebraska, as plaintiff, seeks to recover from J. E. Hill, as principal, and the other defendants, as sureties, on the official bond of the said Hill as treasurer of Nebraska for the term ending in January, 1893. Several questions have been controverted during the trial, although your inquiry will be confined to those issues to which your attention is especially directed by this charge, all others presenting questions of law for which the court is alone responsible.

"2. By taking the oath of office, procuring his official bond to be approved, holding the office of state treasurer and enjoying the emoluments thereof during the entire term, the defendant Hill is estopped to deny his liability on said bond, and such estoppel applies with equal force to the other defendants—his sureties.

"3. It is undisputed that Hill, at the close of his last term of office, indorsed and turned over to Joseph S. Bartley, his successor, in settlement, three certificates of deposit of the Capital National Bank aggregating $285,357.85, upon which the state has since realized $48,993.23, and no more. This suit is to recover $236,364.62, the difference between said sums, the state claiming that the receiving of said certificates by Bartley did not constitute a payment except for the said amount actually realized thereon. The uncontradicted evidence further discloses that Hill, as state treasurer, at the end of his first term had taken credit with the Capital National Bank upon open account the sum of $177,489.84, and also held certificates of deposit issued by said bank aggre-

gating $90,000. The defendants contend that a part, if not all, of these credits was carried through his second term and merged into the certificates of deposit turned over by Hill to Bartley, claiming they are not liable in this suit for the amount of Hill's credit with said bank at the commencement of his second term, save to the extent that he may have converted the same into money.

"4. You are instructed that the payment of money in the hands of a state or county treasurer at the termination of his office, to his successor, can be effectuated only by the delivery of that which by the law of the land is recognized as money. The mere delivery of certificates of deposit issued by a bank upon which no money is realized is not a payment.

"5. It follows from the foregoing rule that the defendants are not chargeable in this action for the amount of the defendant Hill's credit as state treasurer with the Capital National Bank at the commencement of his second term, whether represented by certificates of deposit or open bank account, except for the money, if any, subsequently realized thereon by Hill.

"6. The burden of proof is upon the state to show affirmatively the amounts with which the defendant Hill is chargeable, and these amounts are dependent upon the aggregate sums of money actually received by him during his second term.

"7. The evidence shows a continuous course of dealing between Hill and the Capital National Bank during the second term of the former as state treasurer, and the contention of the state is that the first withdrawals by him in point of time should be applied in discharge of the amount of his credits at the commencement of said term.

Hill, on the other hand, in effect, contends that his intention was at all times to withdraw the money last deposited, and that the transaction in evidence should be so construed. Should you find that there was an agreement or understanding between Hill and the bank with respect to the application of withdrawals by him, such agreement is binding upon the parties to this action. If, however, no such understanding existed, it is the right of the defendant Hill to direct the application to be made of such withdrawals, and it is not within the power of the state to make another or different application thereof.

"8. If the defendant Hill has fully accounted for and paid over all moneys belonging to the state which came into his hands during the period covered by the bond in suit, your verdict should be for the defendants. If Hill has not so accounted, then your verdict should be for the state for the amount disclosed by the evidence that he has received and not paid over, with seven per cent interest thereon from January 14, 1893, to the first day of the present term, to-wit, September 17, 1895."

In addition to the general verdict for defendants, a special verdict was returned under the directions of the court, the substance of which is set out in the opinion by NORVAL, J.

A. S. Churchill, Attorney General, George A. Day, Deputy Attorney General, for the state, E. Wakeley and G. M. Lambertson, of counsel:

The sureties are liable even if Treasurer Hill did not execute the bond. (United States v. Linn, 15 Pet. [U. S.], 290; State v. Bowman, 10 O., 445;

34

*Trustees v. Sheik*, 119 Ill., 579; *Williams v. Marshall*, 42 Barb. [N. Y.], 524; *Parker v. Bradley*, 2 Hill [N. Y.], 584; *Haskins v. Lambard*, 4 Shep. [Me.], 140; *Scott v. Whipple*, 5 Greenl. [Me.], 336; *Keyser v. Keen*, 17 Pa. St., 327; *Johnson v. Weatherwax*, 9 Kan., 75.)

The name John E. Hill, written by him in the body of the bond, is a sufficient execution on his part. (*Taylor v. Dobbins*, 1 Strange [Eng.], 399; *Saunderson v. Jackson*, 2 Bos. & Pul. [Eng.], 238; *Schneider v. Norris*, 2 Maule & Selw. [Eng.], 286; *Morison v. Turnour*, 18 Ves. Ch. [Eng.], 175; *Bleakley v. Smith*, 11 Sim. [Eng.], 150; *Merritt v. Clason*, 12 Johns. [N. Y.], 102; 1 Brandt, Suretyship & Guaranty, p. 151; *Clason v. Bailey*, 14 Johns. [N. Y.], 484; *Davis v. Shields*, 26 Wend. [N. Y.], 341; *Commonwealth v. Ray*, 3 Gray [Mass.], 441; *Penniman v. Hartshorn*, 13 Mass., 87; *Schmidt v. Schmaelter*, 45 Mo., 502; *Wise v. Ray*, 3 Greene [Ia.], 430; *McConnell v. Brillhart*, 17 Ill., 354; *Barry v. Coombe*, 1 Pet. [U. S.], 640; *Palmer v. Grant*, 4 Conn., 389; *Rhode v. Louthain*, 8 Blackf. [Ind.], 413; *Quin v. Sterne*, 26 Ga., 223; *Drury v. Young*, 58 Md., 546; *McLeod v. State*, 13 So. Rep. [Miss.], 268; 1 Brandt, Suretyship & Guaranty, p. 89; *Argenbright v. Campbell*, 3 Hen. & M. [Va.], 144.)

Hill having exercised the duties of the office of state treasurer, under the bond and oath of office is estopped from claiming that he did not execute the bond. (*McNitt v. Turner*, 16 Wall. [U. S.], 363; *Carpenter v. Rannels*, 19 Wall. [U. S.], 146; *Apthorp v. North*, 14 Mass., 167; *Bank of United States v. Dandridge*, 12 Wheat. [U. S.], 64; *Miltenberger v. Schlegel*, 7 Barr. [Pa.], 240; *People v. Johr*, 22 Mich., 465; *Wright v. Leath*, 24 Tex., 32; *Broome v. United States*, 15 How. [U. S.], 155; *Bartlett v. Board of*

State v. Hill.

*Education*, 59 Ill., 367; *Bowman v. Griffith*, 35 Neb., 361.)

The law presumes the delivery of an instrument found in the custody of the officers created by law for its safe-keeping. (1 Devlin, Deeds, sec. 294; *Dedham Bank v. Chickering*, 20 Mass., 335; *McLean v. State*, 8 Heisk. [Tenn.], 23; *Bryan v. City of Des Moines*, 51 Ia., 590; *Boggs v. Olcott*, 40 Ill., 304; *City of Portland v. Besser*, 10 Ore., 243; *Coons v. People*, 76 Ill., 383; *State v. McAlpin*, 4 Ired. Law [N. Car.], 148; *State v. Ingram*, 5 Ired. Law [N. Car.], 442; *Daniels v. Tearney*, 102 U. S., 415; *State v. Mitchell*, 31 O. St., 592; *Pritchett v. People*, 1 Gilm. [Ill.], 525; *Alley v. Adams County*, 76 Ill., 101; *People v. Murray*, 5 Hill [N. Y.], 468; *Ferguson v. Landram*, 5 Bush [Ky.], 230; *United States v. Hodson*, 10 Wall. [U. S.], 395; *Motz v. City of Detroit*, 18 Mich., 526; *McCracken v. Todd*, 1 Kan., 148; *Hyde v. Baldwin*, 17 Pick. [Mass.], 305; *Jacobs v. Miller*, 50 Mich., 119; *Scholey v. Rew*, 23 Wall. [U. S.], 331; *Cowell v. Colorado Springs Co.*, 100 U. S., 55; *McClure v. Commonwealth*, 80 Pa. St., 167; *Perryman v. City of Greenville*, 51 Ala., 507; *Walker v. Mulvean*, 76 Ill., 18; *McCauley v. State*, 21 Md., 556; *Williamson v. Woolf*, 37 Ala., 298; *McClure v. Colclough*, 5 Ala., 65; *Byers v. McClanahan*, 6 Gill & J. [Md.], 250; *Brown v. Murdock*, 16 Md., 201; *Hoffmire v. Holcomb*, 17 Kan., 378; *Smith v. Smith*, 14 Gray [Mass.], 532; *Harbin v. Bell*, 54 Ala., 389; *Bank of St. Marys v. Powers*, 25 Ala., 566; *State v. McDonald*, 40 Pac. Rep. [Idaho], 312; *Iredell v. Barbee*, 9 Ired. Law [N. Car.], 250; Murfree, Official Bonds, 436, 437.)

A public officer and his bondsmen are absolutely liable for all public moneys received, and for which he is accountable, regardless of the fail-

ure of banks in which the funds are deposited, of worthless paper received as money, of theft, robbery, or unavoidable loss. (*State v. Keim*, 8 Neb., 63; *First Nat. Bank of South Bend, Ind., v. Gandy*, 11 Neb., 431; *Cedar County v. Jenal,* 14 Neb., 254; *Wayne County v. Bressler*, 32 Neb., 818; *State v. Hill*, 38 Neb., 698; *United States v. Prescott*, 3 How. [U. S.], 587; *United States v. Morgan*, 11 How. [U. S.], 160; *United States v. Dashiel*, 4 Wall. [U. S.], 185; *Muzzy v. Shattuck*, 1 Den. [N. Y.], 233; *Commonwealth v. Comly*, 3 Pa. St., 372; *State v. Harper*, 6 O. St., 607; *State v. Bartley,* 39 Neb., 353; *Inhabitants of Town of Hancock v. Hazzard*, 12 Cush. [Mass.], 112; *Halbert v. State*, 22 Ind., 125.)

The appointment of the Capital National Bank as a state depository after the expiration of Treasurer Hill's term of office did not release him and his sureties from the liability that had already accrued on the bond.

There has been no ratification by the state of the deposits made by Hill in the Capital National Bank.

The sureties on the bond are bound by the admissions of Hill and by entries in the book made by him in the line of his official duties. Such admissions are part of the *res gestæ*. (*Barry v. Screwmen's Benevolent Association*, 67 Tex., 250; *Northumberland v. Cobleigh*, 59 N. H., 250; *Bank of Brighton v. Smith*, 12 Allen [Mass.], 243; *Placer County v. Dickerson*, 45 Cal., 12; *Atlas Bank v. Brownell*, 9 R. I., 168; *Blair v. Perpetual Ins. Co.*, 10 Mo., 567; *Drummond v. Prestman*, 12 Wheat. [U. S.], 515; *Wilson v. Green*, 25 Vt., 450; *Middleton v. Melton*, 10 B. & C. [Eng.], 317; *Pendleton v. Bank of Kentucky*, 1 T. B. Monroe [Ky.], 171; *Morley v. Town of Metamora*, 78 Ill., 394; *Dobbs v. Justices*, 17 Ga., 624; *Casky v. Haviland*, 13 Ala., 314.)

State v. Hill.

A debtor paying money has the right to direct its application. If he omits to do so, the creditor may make the application at any time before a controversy arises. (*Robinson v. Doolittle*, 12, Vt., 246; *Pierce v. Knight*, 31 Vt., 701; *Taylor v. Coleman*, 20 Tex., 772; *Poulson v. Collier*, 18 Mo. App., 583; *Callahan v. Boazman*, 21 Ala., 246; *Whetmore v. Murdock*, 3 W. & M. [U. S. C. C.], 390.)

After controversy arises neither debtor nor creditor has the right to make an appropriation of payments. (*Lazarus v. Friedheim*, 11 S. W. Rep. [Ark.], 518; *Milliken v. Tufts*, 31 Me., 497; *United States v. Kirkpatrick*, 9 Wheat. [U. S.], 720; *Applegate v. Koons*, 74 Ind., 247; *Wendt v. Ross*, 33 Cal., 650; *Thurlow v. Gilmore*, 40 Me., 378; *Jones v. United States*, 7 How. [U. S.], 684; *Harrison v. Johnston*, 27 Ala., 445; *Longan v. Taylor*, 130 Ill., 412; *Dall v. People*, 34 N. E. Rep. [Ill.], 413; *McCune v. Belt*, 45 Mo., 174; *Hersey v. Bennett*, 9 N. W. Rep. [Minn.], 500.)

*J. H. Broady*, for defendant Hill:

The early Nebraska cases should not be followed, but are distinguishable from the case at bar.

The case of *Cedar County v. Jenal*, 14 Neb., 254, is not analogous. In that case the certificate offered in payment as money never went beyond the control of the payor, never was accepted, indorsed, and delivered by the payee to the bank, nor did the payee ever receive credit at the bank subject to check, nor check any part of it out. A striking feature of the decision in that case is that there is no authority whatever cited except section 124 of the Criminal Code, nor is there any

discussion of the principles of law of embezzle-
ment.

*State v. Sheldon*, 10 Neb., 452, is quite peculiar.
It was an action of *quo warranto* to determine who
was treasurer of Greeley county. The second
paragraph of the syllabus is in these words: "The
fact that the public funds have been stolen from
the treasury is no legal justification for the failure
of the treasurer to account for them;" and yet the
opinion truly states all there was in the case in
this language: "Two questions are to be deter-
mined in this case: First—The right of the board
of county commissioners to summarily remove the
treasurer from office without giving him an oppor-
tunity to make a defense. Second—Must a judg-
ment of ouster be entered?" So it appears that
paragraph 2 of the syllabus was a matter not in
the case nor necessary to its decision. It is there-
fore only a *dictum* of the court outside the case
and not an authority as such. The same pecul-
iarity applies to this case as to the other, that it
neither cites any authority nor discusses princi-
ples of law upon which to base the second para-
graph of the syllabus.

In *State v. Keim*, 8 Neb., 63, counsel for plaintiff
contended that the ownership of state funds
was in the state, saying in their brief that
the statutes stamped the ownership of public
funds in the state. Counsel for defendant in
error contended: "The money which he [treas-
urer] receives becomes his own money and he is
liable absolutely for it to the state, on his official
bond." The decision of affirmance, based upon
section 124 of the Criminal Code, says: "It is true
that although such loaning or depositing of the
public money was unauthorized and contrary to

the spirit and policy of our government, yet after it was done in point of fact, it could be ratified by the state." The same peculiarity runs through this case, and on the question of whether the treasurer or the state is the owner of the public funds, and on the question of embezzlement, it cites no authority except the statute, nor does it discuss legal principles; but this decision, as well as all of them, is based upon section 124 of the Criminal Code. Their logic is that putting in the bank to the credit of the state, without any actual conversion on the part of the treasurer or any want of good faith, was an embezzlement; that actual conversion, bad intent, or want of diligence are all immaterial. No wonder there were no citations nor discussions of legal principles to sustain such a theory! But the turning point of the case being embezzlement, shows that the court intended to hold in this case as well as in the others that the treasurer was not the owner of the funds, but that the state is the owner; that the treasurer was not a debtor, but a bailee of the funds; and yet, by a process of reasoning we fail to understand, or principles of law to us entirely new, they hold that the owner cannot recover the property. They hold that it is a bailment, but they deprive the owner of the rights he has in other sorts of bailments, or the rights the beneficiary has in other sorts of trusts. The same criticism applies to *First Nat. Bank of South Bend, Ind., v. Gandy*, 11 Neb., 431.

In support of an argument on the proposition that the depositing of the money in the Capital National Bank by defendant Hill did not make him liable for the loss, reference is made to the following authorities: *Gray v. Havemeyer*, 3 C. C.

A., 497; *Estate of Law*, 144 Pa. St., 499; *State v. Gates*, 67 Mo., 139.

Hill's term, by law, ceased January 5, 1893. At that time the state depository law took effect. Because of the delay of the legislature in canvassing the election returns, Bartley could not qualify until January 14. For this reason Hill continued, at least *de facto*, in office and held things *in statu quo* from January 5 to January 14. In the meantime the new statute was in force recognizing the banks of the state as a better place to keep state funds, and recognizing and making the treasurer the agent of the state to so deal with the banks and with the public funds accordingly. From January 5, 1893, until January 14, Hill was, at least *de facto*, treasurer, and was such agent of the state; and after January 14, 1893, Bartley was such agent. The actions of both as to the deposits in the Capital National Bank were the actions of the state, and moreover the making of that bank a state depository by the state according to law, and putting the funds therein and taking the credit for that money in the Capital National Bank as a state depository, again ratified the same, which ratification related back to the beginning of the transaction that led to and culminated in such credit to the state under the state depository law. It was a waiver of wrongs or irregularities, if any, in the prior stages of the proceedings, and was therefore an estoppel against urging them in this cause. (*State v. Gates*, 67 Mo., 139; *People v. Stephens*, 71 N. Y., 527; *Clark v. Stanley*, 66 N. Car., 59; Throop, Public Officers, secs. 3, 21, 551.)

*Charles O. Whedon*, for the sureties:

It is alleged in the answer that the defendants who are sued as sureties signed the instrument sued on upon the express condition that it should not be delivered to the obligee until it had been signed by the principal therein named,—the defendant Hill, whose name appears in the body of the bond as principal. · It is further alleged that said Hill never signed said instrument, and that it was never delivered with the knowledge or consent of the defendants sought to be held as sureties, and if it was ever delivered it was against the consent of said defendants and in violation of said condition.   These alleged facts constitute a defense. (*Board of Education v. Sweeney*, 48 N. W. Rep. [S. Dak.], 302; *Johnston v. Kimball Township*, 39 Mich., 187; *Hall v. Parker,* 39 Mich., 287; *Green v. Kindy*, 43 Mich., 279; *Wells v. Dill*, 6 Martin [La.], 665; *State v. Austin*, 35 Minn., 51; *Duncan v. United States*, 7 Pet. [U. S.], 448; *Bunn v. Jetmore*, 70 Mo., 228; *Bean v. Parker*, 17 Mass., 591; *Wood v. Washburn*, 2 Pick. [Mass.], 24; *Goodyear Dental Vulcanite Co. v. Bacon*, 151 Mass., 460; *State Bank v. Evans*, 15 N. J. Law, 155; *Hall v. Parker*, 37 Mich., 590; *Fletcher v. Austin*, 11 Vt., 447; *Hessell v. Johnson*, 63 Mich., 623; *Russell v. Annable*, 109 Mass., 72; *Bibb v. Reid,* 3 Ala., 88; *Pepper v. State*, 22 Ind., 399; *Allen v. Marney*, 65 Ind., 398; *Wild-Cat Branch v. Ball*, 45 Ind., 213.)

The fact that the name of Hill appeared in the instrument as principal, and that at the time it came into the possession of the governor of the state his name was not signed thereto as principal, shows that the instrument was incomplete, and that was sufficient notice to the obligee therein

named, and the best notice that could have been given, that the principal named was to sign the instrument before delivery. (*Hall v. Smith*, 14 Bush [Ky.], 606; *Sharp v. United States*, 4 Watts [Pa.], 21; *Fletcher v. Austin*, 11 Vt., 447; *Dair v. United States*, 16 Wall. [U. S.], 1.)

If there is anything on the face of the bond to apprise the obligee that the bond has been delivered by the sureties upon a condition not complied with, the sureties may plead the failure as a defense to the action. (*Cutler v. Roberts*, 7 Neb., 4; *Gray v. School District*, 35 Neb., 446.)

These defendants were under no legal or moral obligation to see that the principal had signed the instrument. They had a right to rely upon the legal discharge of official duty by those whose duty it was to see that a proper bond was executed, and to dismiss all oversight of it. (*Fletcher v. Leight*, 4 Bush [Ky.], 303.)

A statute of Wisconsin required the treasurer to keep his office at the capitol, to receive and have charge of all money paid into the state treasury, and pay the same out as provided by law. The governor and attorney general of that state were required at least once each quarter year to examine and see that all the money appearing on the books of the treasurer and secretary of state as belonging to the state was in the vaults of the treasury. The statute also made it *prima facie* evidence of embezzlement of the public funds if the treasurer should loan or deposit the same for his own gain or advantage without special authority. The statute contained this provision: "Every public officer shall promptly pay over, as required by law, the same moneys received and held by him by virtue of his office." Construing

these provisions of the statute, the supreme court of Wisconsin held (1) that the deposit of public moneys in banks by the state treasurer in the name of his office, payable at any time, but only upon his official draft, was not unlawful; nor was it unlawful for him to stipulate for and receive interest on such deposits; (2) that such deposits, having been made in accordance with long-continued usage and for convenience in the transaction of the business of his department, were not made for gain, profit, or advantage to the treasurer within the meaning of the statute making such deposit by a public officer for his own gain, profit, or advantage *prima facie* evidence of embezzlement; (3) that the treasurer was not, by the statute, required to pay the identical moneys by him received as such officer, but money having the same value and essential qualities as that paid into the treasury; (4) that the certificates of deposit or other vouchers for money deposited in solvent banks, payable on demand, were money within the meaning of the statute requiring the governor and attorney general from time to time to see that all money belonging to the several funds was in the vaults of the treasury; (5) that a deposit of public funds in banks subject to draft at any time was not an investment for such funds prohibited by statute. (*State v. McFetridge*, 84 Wis., 473.)

It is a fact admitted by the pleadings that the custom and usage of receiving, depositing, and paying out the public funds as stated in the answer had obtained in this state since its organization and that such custom and usage were known of all men, the courts, and the legislature. It would be practically impossible to transact public

business in any other way. The state has provided no place in which the large amount of money which comes into the hands of the treasurer can be safely kept. It is not the policy of the state that money which is paid as taxes shall be locked up in a vault and withdrawn from circulation. The state holds a large amount of bonds which belong to the permanent school fund. These securities have been kept in the vault in the office of the state treasurer, where they were insecure. Because of the danger of their being stolen, the legislature in 1887 passed an act requiring that all such bonds should be stamped with the words, "This bond belongs to the permanent school fund of the state of Nebraska, and is not negotiable," which statement the state treasurer is required to sign. (Session Laws, 1887, ch. 79, p. 614.) The title of the act expresses the fear that said securities might be lost by theft or otherwise, and to prevent their negotiability the act was passed. No precaution has been taken by the state to prevent the stealing of money of the state from the vault of the treasury, because it was known that the money was not kept in the vault. It has never been supposed that the treasurer would keep the money which he received in his office. It is impossible that a treasurer who followed the custom of depositing public funds in a bank for safe-keeping,—a custom which had been followed for thirty years,—should be convicted of embezzlement for making such deposit, especially in view of the fact that the state had furnished no safe place for keeping such funds. As to the question of custom and usage reference is made to the case of *Slidell v. Grandjean*, 111 U. S., 413.

By the giving of the depository bond, its approval by the proper officers, and the filing thereof with the auditor, a contract was entered into between the state and the bank, and the depositing of the certificates in the bank was in part performance of that contract.   By the terms of this contract the bank became entitled to receive on deposit current funds of the state to an amount not exceeding one-half the amount of the bond, which funds should be subject to the check of the treasurer, and the amount on deposit might be increased or diminished as the treasurer might determine.   On its part the bank became liable to pay to the state interest on the funds deposited at the rate of three per cent per annum on daily balances, interest payable quarterly.   The terms of this contract are not only found in the act of 1891, but they are embodied in the bond given by the bank.   There is no contention that the requirements of the act of 1891 were not complied with in the giving of the bond, its form, approval, or filing.   It is admitted that the deposit was not made until after the bond had been approved and filed.   The state is bound by this contract. (People v. Stephens, 71 N. Y., 527; Sholes v. State, 2 Chand. [Wis.], 182; Metzel v. State, 16 Wis., 370; State v. Dennis, 39 Kan., 509; Danolds v. State, 89 N. Y., 36; United States v. Bank of Metropolis, 15 Pet. [U. S.], 377; Carr v. State, 11 L. R. A., 370; Georgia Penitentiary Cos. v. Nelms, 71 Ga., 301; Fletcher v. Peck, 6 Cranch [U. S.], 88; Hall v. Wisconsin, 103 U. S., 5; Davis v. Gray, 16 Wall. [U. S.], 232; Curran v. Arkansas, 15 How. [U. S.], 308; Abeel v. Culberson, 56 Fed. Rep., 329; State v. Flint & P. M. R. Co., 89 Mich., 481; Houston v. Cook, 153

Pa. St., 43; *Sheets v. Selden's Lessee*, 2 Wall. [U. S.], 177; *Hodgson v. Dexter*, 1 Cranch [U. S.], 345.)

*John H. Ames*, also for sureties:

The statutes of this state (Compiled Statutes, sec. 12, ch. 10) enact: "All official bonds shall be obligatory upon the principal and sureties for the faithful discharge of all the duties required by law of such principal." The condition of the bond in suit is that "the said John E. Hill shall well and truly in all things perform the duties of treasurer of the state of Nebraska" during his term of office. These are the usual terms of the ordinary common law bond, such as is customarily given by trustees, receivers, executors, and administrators, and the language of the statute is conclusive of the legislative intent that the liability of the treasurer and his sureties shall be the common law liability of such trustees and officers. It is in effect the same as though the legislature had said: "The bond shall be obligatory upon the principal and sureties as in cases of trustees at common law."

The state treasurer is not responsible as an insurer of the funds and moneys coming into his hands by virtue of his office. His liability is that of a bailee for hire, and he is held to the exercise of good faith and honesty and of that degree of care and skill which a reasonably prudent man would exercise in the conduct of like business of his own. Beyond this his responsibility does not extend. The contrary doctrine resting upon the authority of *United States v. Prescott*, 3 How. [U. S.], 578, has been abandoned. (*United States v. Thomas*, 15 Wall. [U. S.], 337; *Cumberland County v. Pennell*, 69 Me., 357; *State v. McFetridge*, 84 Wis.,

State v. Hill.

473; *State v. Walsen*, 17 Colo., 170; *Commonwealth v. Godshaw*, 17 S. W. Rep. [Ky.], 737; *Renfroe v. Colquitt*, 74 Ga., 618; *Rock v. Stinger*, 36 Ind., 346; *Bevans v. United States*, 80 U. S., 56; *United States. v. Dashiel*, 4 Wall. [U. S.], 182; *Walker v. British Guaranty Association*, 18 Ad. & E., n. s. [Eng.], 276; *Wilson v. People*, 34 Pac. Rep. [Colo.], 944; *Rose v. Hatch*, 5 Ia., 149; *Whitfield v. Le Despencer*, Cowper [Eng.], 765; *York County v. Watson*, 15 S. Car., 1; *Board of Supervisors v. Dorr*, 25 Wend. [N. Y.], 440; *Muzzy v. Shattuck*, 1 Den. [N. Y.], 233; *People v. Faulkner*, 107 N. Y., 477.)

A deposit by a custodian of public or trust funds of the moneys in his possession, in a bank of reputed solvency, is such a prudent and careful disposition of the funds as will relieve him from responsibility though the bank subsequently fails and the funds are lost. There is a plain and well defined distinction between the loaning of such funds and the depositing of them in a bank, unmixed with the depositor's private or personal moneys, and expressly in his official character. (*People v. Faulkner*, 107 N. Y., 477; *State v. McFetridge*, 84 Wis., 473; *Comstock v. Gage*, 91 Ill., 328; *Millard v. Lawrence*, 16 How. [U. S.], 256; *Moulton v. McLean*, 5 Colo. App., 454; *Payne v. Gardiner*, 29 N. Y., 146; *Estate of Law*, 144 Pa. St., 499, 14 L. R. A., 103.)

*Griggs, Rinaker & Bibb, Cowin & McHugh, George E. Pritchett, J. W. Deweese, F. M. Hall, W. Q. Bell,* and *Abbott, Selleck & Lane,* also for the sureties.

RYAN, C.

This action was brought in this court upon the bond of J. E. Hill, formerly treasurer of this state,

as it was held in *Re Petition of Attorney General,*
40 Neb., 402, might properly be done. The gen-
eral verdict of the jury was in favor of the defend-
ants, and upon plaintiff's motion for a new trial,
and upon defendants' motion for judgment upon a
special verdict also found by the jury, the ques-
tions hereinafter considered have been presented
in argument. In the consideration of these ques-
tions it may be of some use to refer to the case of
*State v. Hill,* 38 Neb., 698, in which an attempt was
made to acquire jurisdiction of such defendants
as were non-residents of Douglas county, by rea-
son of averments in the petition that the defend-
ant Hill had been guilty of breaches of his bond
in making deposits of public moneys in certain
banks in the city of Omaha. From the petition in
this case were omitted this averment, and perhaps
such others that it might be unsafe to merely refer
to the statements of facts, as therein given, as fur-
nishing a complete summary of those now to be
reviewed.

In the case at bar it was alleged that, at the
general election held in 1890, John E. Hill was
elected treasurer of this state for the two-years
term which began on the first Thursday after the
first Tuesday in January, 1891. This term, it was
alleged, he served as treasurer, the sureties on his
bond being his co-defendants in this action, and
that, upon the 14th day of January, 1893, he sur-
rendered said office to his successor, Joseph S.
Bartley. It was further averred that when John
E. Hill entered upon his duties on January 8, 1891,
he had in his possession, as incumbent of the same
office for the term immediately preceding, the sum
of one million five hundred and twenty-four thou-
sand five hundred and fifty-four dollars and sev-

enty-four cents ($1,524,554.74); that upon entering
upon his duties under the bond sued on he re-
ceived from county treasurers of the state the
additional sum of four million two hundred thou-
sand eight hundred and thirty-four dollars and
fifty cents ($4,200,834.50). The total sum with
which it was claimed that the defendant Hill'
should be chargeable upon his bond sued upon
was the aggregate of the above two sums, to-wit,
the sum of five million seven hundred and twenty-
five thousand three hundred and eighty-nine dol-
lars and twenty-four cents ($5,725,389.24). Al-
though in general terms the liability of the treas-
urer was charged as to the immense amounts
above set out, the breaches alleged were within
the range of comparatively familiar figures.
These breaches, two in number, were described in
such language as indicated the intention of the
pleader to avail himself of the technical rule justi-
fied, to some extent, by the case of *Cedar County v.
Jenal*, 14 Neb., 254. It might happen that an
attempt to abbreviate would result in obscuring
the theory upon which the petition was drawn, as
well as the line of defense adopted by the defend-
ants in their answer, and the emphasis of the
theory of the petition found in the reply. At the
risk of tediousness an attempt will therefore be
made to illustrate the material issues joined and
tried with quotations made with great freedom
from the pleadings, beginning with the petition,
in which were the following averments:

"And the plaintiff, for assigning and setting
forth a breach and violation of the conditions of
the said bond, alleges that the said John E. Hill,
in the county of Lancaster, in the state of Ne-
braska, during his last term of office did from time
35

to time unlawfully deposit in and loan to the
Capital National Bank of Lincoln, a corporation
located and doing business in the county and state
last aforesaid, divers large sums and portions of
the moneys so as aforesaid held by him and be-
longing to the state of Nebraska, amounting in·all
to the sum of two hundred and eighty-five thou-
sand three hundred and fifty-seven dollars and
eighty-five cents ($285,357.85) and more, the par-
ticular sums so deposited and the particular times.
when they were so deposited the plaintiff is un-
able more definitely to state. A part of the said
moneys so unlawfully loaned and deposited were,
from time to time, during his said last term of
office, collected and received from said bank, and
paid out and accounted for by the said Hill as
treasurer as aforesaid for the use and benefit of
the state of Nebraska.   But, on the 14th of Janu-
ary, 1893, and when he surrendered his said office
to his said successor, there remained of the said
moneys so unlawfully loaned and deposited the
sum of two hundred and eighty-five thousand
three hundred and fifty-seven dollars and eighty-
five cents ($285,357.85) or more, which the said
Hill, as such treasurer, had not in any manner
used or paid out for the use and benefit of the
state of Nebraska or in any manner accounted for,.
and which he refused and failed to pay over to his.
said successor, by reason of which the said John
E. Hill converted to his own use the said sum of
two hundred and eighty-five thousand three hun-
dred and fifty-seven dollars and eighty-five cents
($285,357.85).

"Second Breach.—And the plaintiff, for assign-
ing and setting forth another and second breach
and violation of the conditions of said bond, al-

leges that of the moneys so as aforesaid received and held by said John E. Hill as such state treasurer and belonging to the state of Nebraska there still remained at the end of his said last term of office the sum of one million four hundred and forty-four thousand five hundred and fifty-six dollars and forty-two cents ($1,444,556.42) which he had not, at any time, disbursed upon any warrant or warrants drawn upon the state treasury, according to law, or at any time paid out, disbursed, or disposed of lawfully, or in any authorized manner, or for any lawful, proper, or authorized purpose, or for the use or benefit of the state of Nebraska, and which sum it was his duty to pay over and deliver, at the end of his last term of office, to-wit, on the 14th day of January, A. D. 1893, to his said successor in office; but he failed and refused, except as hereinafter mentioned, to so pay over and deliver to him the said sum or any part thereof, or at any time, or in any manner whatever to account for the same, or any part thereof, to his said successor in office, or otherwise, save that, as the plaintiff is informed and alleges, the said John E. Hill did then pay and turn over to his successor certain small sums of money, the exact amount of which is unknown to the plaintiff, and did assign, transfer, and deliver to his said successor divers and sundry certificates of deposit of certain banks and banking institutions located in the state of Nebraska and other choses in action, the precise nature of which is not fully known to the plaintiff, and which the said John E. Hill in some manner induced his said successor to receive and accept in the place of, and instead of money, among which were, as plaintiff is informed and alleges, certain certifi-

cates of deposit issued by the Capital National Bank of Lincoln, payable to the state treasurer of Nebraska, for certain sums of money therein respectively specified, amounting in the aggregate to the sum of two hundred and eighty-five thousand three hundred and fifty-seven dollars and eighty-five cents ($285,357.85), of which amount, as the plaintiff is informed and believes to be true, the said Joseph S. Bartley, successor in the office of the said John E. Hill, subsequently, and on or before the 21st day of January, A. D. 1893, received from the said bank, through or by means of said certificates of deposit, for the use and benefit of the state of Nebraska, divers and sundry sums of money, amounting in the aggregate to the sum of forty-eight thousand nine hunderd and ninety-three dollars and twenty-three cents ($48,993.23), but has never, at any time, received any further or other sums of money upon, through, or by means of the said last mentioned certificates of deposit. And, as the plaintiff alleges upon information and belief, the said Capital National Bank was at the time when said John E. Hill, treasurer, so transferred and delivered the said certificates of deposit to his said successor, and ever since has been, wholly insolvent, and from and after the said 21st day of January, A. D. 1893, has, at all times, failed and refused to pay any sums of money whatsoever upon or toward the amounts payable, according to the tenor of the said certificates of deposit. And his said successor has since that time, as plaintiff is informed and believes, received upon or from, or by means of others of said certificates of deposit or choses in action, and applied for the use and benefit of the state, certain sums of money, the exact amount of which is not

known to the plaintiff. But the said John E. Hill failed and refused, and has ever since failed and refused, to lawfully pay over, disburse, or account for, or pay over to his successor in office, or otherwise or in any manner whatever to apply for the use or benefit of the state of Nebraska, the sum of two hundred and thirty-six thousand three hundred and sixty-four dollars and sixty-two cents ($236,364.62), and more, of the moneys so received by him as such state treasurer and belonging to the state of Nebraska remaining in his hands at the end of his said last term of office, and in some way converted the same to his own use, and which has not been received by or in any manner applied for the use and benefit of the plaintiff. And by reason of the premises aforesaid the said defendants became and still are indebted to the plaintiff, the state of Nebraska, and the plaintiff has sustained damages in the sum of two hundred and thirty-six thousand three hundred and sixty-four dollars and sixty-two cents ($236,364.62), for which sum, with interest thereon from the 14th day of January, 1893, the plaintiff demands judgment, and that it may have such further relief in the premises as it may be entitled to."

In the answer filed by John E. Hill it was alleged that his successor's term should have commenced on January 5, 1893, but that, owing to the fact that the legislature had failed seasonably to canvass the vote of such successor, he did not enter upon the duties of his office until January 14, 1893; that the condition of business in the state treasurer's office remained unchanged, and that, when said office, its funds, and property were turned over to John E. Hill's successor on January 14, 1893, they were exactly in the same condi-

tion as they had been on the 5th day of the same
month, when said Hill had submitted to the state
auditor his accounts and conduct as such treas-
urer, and when the same had been by said auditor
examined and passed upon, approved, and found
correct. In this answer it was also alleged that,
upon the installation of Joseph S. Bartley as
treasurer he examined and passed upon the ac-
counts, papers, certificates of deposit, and other
evidences of the funds of the state; that there was
so turned over to Joseph S. Bartley, as treasurer,
no cash, except, perhaps, five hundred dollars
($500) in amount; that among the things turned
over to Hill's successor there was a certificate of
deposit of the Capital National Bank made to the
order of the treasurer of the state of Nebraska for
the said sum of two hundred and eighty-five thou-
sand three hundred and fifty-seven dollars and
eighty-five cents ($285,357.85), which represented
the same amount mentioned in the petition, and
that this certificate had been received by Treas-
urer Bartley and accepted on the same day that
the Capital National Bank was designated and
became a state depository according to law, and
in lieu thereof said Bartley received an open ac-
count at said bank subject to check and surren-
dered to said bank its certificate of deposit; that
thereafter, on January 16, 1893, the said Joseph S.
Bartley, as treasurer, checked out of said bank
and received as such over thirty-five thousand dol-
lars ($35,000) of the said money for which he had
been given an open account subject to check; that
between the 16th and 20th of January, 1893, said
Bartley could have checked out and received from
the bank the whole amount of his open account as
aforesaid, but refrained from checking out more

than fifty thousand dollars ($50,000) between said two last named dates. It was alleged in the answer, in effect, that by the Capital National Bank having been designated as a depository bank, and having given bond and duly qualified as such, the opening of an account with it operated to create a credit in favor of the state to the amount of such account, although such credit was based solely upon a deposit of the bank's own evidence of indebtedness, and that from thenceforth John E. Hill was not in any way a party to or in privity with any party to such open account. Upon information and belief it was alleged in this answer that said bank had closed, and at the time such answer was filed was in the hands of a receiver, and that at such closing there was still a portion of said open account which had not been withdrawn from said bank, and that for this balance unpaid Joseph S. Bartley, as treasurer, had filed his claim therefor against said bank and that said demand had been allowed in favor of the plaintiff.

In reply it was admitted that defendant Hill undertook and purported to turn over to his successor all, or what he claimed to be all, the money, excepting an amount not exceeding five hundred dollars ($500) in the form of certificate deposits of or from various banks in the state of Nebraska, or some similar choses in action, but the plaintiff alleged "that all such transactions excepting the turning over of such sum of actual money were illegal, unauthorized, and in nowise binding upon the state of Nebraska." There were contained in the reply the following averments of the plaintiff: "It admits, upon information and belief, that the defendant's successor, J. S. Bartley, did receive and purport and pretend to accept as money, and

did accept in lieu and instead of money, certain
certificates of deposit and other papers purport-
ing to be evidences of the funds of the state, and
among them, "three certificates of deposits of the
Capital National Bank aforesaid, made to the
order of the treasurer of the state of Nebraska,
for the aggregate sum of two hundred and eighty-
five thousand three hundred and fifty-seven dol-
lars and eighty-five cents ($285,357.85),—but not
in one certificate for said sum as alleged in the
answer,—one of the said certificates being for the
sum of one hundred and fifty thousand dollars
($150,000), one for the sum of one hundred thou-
sand dollars ($100,000), and the other for the sum
of thirty-five thousand three hundred and fifty-
seven dollars and eighty-five cents ($35,357.85),
and was induced and prevailed upon by the said
defendant to receive and accept the said certifi-
cates of deposit in lieu and instead of money to
the amount thereof, all of which transactions, the
plaintiff alleges and submits to the court, were
unauthorized, void, and in nowise binding upon
the state of Nebraska." In general terms it may
be said that in this reply it was admitted that
Joseph S. Bartley indorsed the above described
certificates of deposit, and, upon surrender of the
same, received credit in open account with said
bank for the aggregate amount of two hundred
and eighty-five thousand three hundred and fifty-
seven dollars and eighty-five cents ($285,357.85);
that between January 16 and January 21, 1893,
said Bartley did check out portions of said money
aggregating $48,993.23. Following these admis-
sions was the following language: "But the
plaintiff specially denies that thereby the amount
represented by the said certificates of deposit, or

any amount, became the money of the state of
Nebraska in the said bank, and alleges and sub-
mits to the court that the said transactions were
illegal, and unauthorized, and in nowise binding
upon the state of Nebraska." It was furthermore
admitted that the Capital National Bank had
been designated as a depository as alleged in the
answer, and that it afterwards closed and is in
the hands of the comptroller of the currency of the
United States and in process of liquidation, and
that there purports to remain due from said bank
to J. S. Bartley, as treasurer, a balance of the said
account, and that, as state treasurer, he has filed
a claim against said bank, but specially denied
that plaintiff was responsible for or bound by the
filing thereof.

From the above description of the averments of
the several pleadings relative to the nature of
plaintiff's cause of action, and of the defenses
thereto presented, it is clear, beyond question,
that this suit was brought to recover the exact
amount evidenced by the certificates of deposit
turned over by Hill to his successor, less such ag-
gregate amounts as had been thereon realized in
money; that is, the sum of $236,364.62, being the
difference between $285,357.85 and $48,993.23. It
is insisted by the defendants that this, in the form
of certificates of deposit, was actually turned over
to and received by Joseph S. Bartley; also, that
he, as treasurer, opened an account with the Capi-
tal National Bank as a state depository duly des-
ignated and approved as such by the proper offi-
cers of the state, and that thereafter defendant
Hill was in nowise accountable to the state for
this sum. On the other hand, the state insists

that, under the decisions of this court, nothing but cash can operate or be recognized as payment; and that, therefore, as to whatever sums the defendant became liable for as treasurer he could claim an acquittance only by showing payment of actual cash. In line with this theory the defendants upon the trial urged that if only cash could be recognized for one purpose it was equally unavailable for any other purpose, and that, therefore, the defendants could be held liable only for such cash as actually was proven to have come into the hands of State Treasurer Hill. In respect to this branch of the case the evidence was solely that of Mr. Bartlett, Mr. Hill's deputy, who testified as follows:

Q. Can you tell me how much money Mr. Hill had in the treasury on the day, how much in cash he had, when he entered upon his second term, and how much he received from himself as his own successor in actual money?

A. I think it was $523. * * *

Q. Mr. Bartlett, are you now able to state how much actual money Treasurer Hill deposited in the Capital National Bank during his second term of office?

A. Well, I find during Mr. Hill's second term he deposited in actual cash in the Capital National Bank, $10,300.

Q. How much actual cash did he draw out of that bank during that same period?

A. He drew for the use of the office from that bank $17,785.

Q. For the use of the office? Just explain what you mean by that. Tell how it was drawn out.

A. Paid warrants with it.

Q. To whom would the check be drawn?

A. Drawn payable to currency. We would take the check down to the bank and draw currency, bring it up to the office and use that to pay warrants.

Upon the theory of the plaintiff the sum for which Mr. Hill was accountable was the amount evidenced by the three certificates of deposits above referred to. There was no conflict in the evidence in regard to these three certificates being made up of other certificates running back through the entire term for which the bond sued upon was given. Whatever of cash was put into the Capital National Bank, and even more, was by the above quoted evidence shown to have been paid out upon warrants, so that the language used in the petition in a general way, outside of that referring to the above three certificates, found nothing in the proofs to justify a recovery.

The theory upon which this action was begun, and, indeed, was tried, had its origin in *Cedar County v. Jenal*, 14 Neb., 254. That case was originally brought on behalf of Cedar county to recover from Peter Jenal, who had been treasurer of said county, and the sureties on his official bond, a sum of money which it was claimed he had failed and refused to pay over to L. M. Howard, his successor, at the expiration of his term of office. The defendants, by their answer, admitted that at the expiration of Jenal's term the sum of money demanded was in his hands belonging to the county, but they alleged in defense full payment "in the manner required by law." The judgment in favor of the defendants was reversed because of the mistaken view of the law embodied in the following instruction, to-wit: "Mr. Jenal

testifies that he had the amount due from him to the county on deposit in a bank at Yankton; that he requested Mr. Howard, 'his successor,' to go with him to that place and receive the money; that Mr. Howard refused so to do, but instructed Mr. Jenal to bring him a small portion thereof and deposit the rest to his credit in the same bank. Now if you find that these instructions were given and in pursuance thereof Mr. Jenal did bring so much of the money as directed, and left the rest on deposit in the bank to the credit of Mr. Howard, changing the deposit from his name to that of Mr. Howard, and that this was agreed upon by both Howard and Jenal as a payment, and if you further find that the bank at that time had sufficient funds and was able to pay the amount of such deposit, then such transaction would be a payment of such amount of $3,500 to Mr. Howard, and you would be obliged to find for the defendant." Commenting upon this instruction, LAKE, J., who delivered the opinion of this court, said: "Very clearly to our minds the transaction referred to in this instruction was not a payment of the public money by Jenal to his successor, nor did it relieve the defendants from liability on their bond." There can be no question that the decision of this case was as it should have been, upon the record presented. The bank in which the funds were deposited was in the territory of Dakota. The payment claimed was assumed to be binding upon the county solely because the incoming treasurer had agreed to accept, instead of money, a credit in such bank in favor of himself as treasurer of the county. The first paragraph of the syllabus was sweeping in its enunciation of the general principle involved, and was as fol-

State v. Hill.

lows: "The payment of money in the hands of a county treasurer, at the termination of his office, to his successor, can be effectuated only by the delivery of that which by the law of the land is recognized as money." As applied to the facts involved in the case then under consideration the above principle was just; and yet it is conceivable that here might be facts to which this principle would equally apply, and yet that thereby a grave injustice would be sanctioned. For instance, under the provisions of our present depository law it might admit of grave doubt whether or not the state, having selected a depository and required deposits of public moneys to be made in depositories only, should not be required to recognize such deposits as the equivalent of actual cash in the hands of the outgoing treasurer, and that, when such credit in a bank had been transferred to his successor, the state should be held bound as though actual cash to the same amount had passed between the two treasurers in making a transfer of the office from one to the other. On the other hand, it might admit of serious question whether or not the incoming treasurer or his sureties should be held as for cash with respect to such amounts as had been credited in his favor by the depository bank, no matter how such credit may have been obtained. These questions are mentioned merely to illustrate the danger of stating a very general proposition as a rule of universal application.

Since the unsuccessful party by its pleadings, as well as throughout the entire trial, and upon presentation of its motion for a new trial, has insisted that the depository law which went into effect at the beginning of Treasurer Bartley's

term has no applicability to the facts of this case, it is not necessary to determine the queries above suggested, in determining plaintiff's motion for a new trial. The special verdict of the jury was consistent with its general verdict. It is not deemed necessary to set out this special verdict at length in the already extended description of the issues and evidence involved in this case. The facts therein found were, that on January 14, 1893, the officers by law required to approve depository bonds, to-wit, the governor, secretary of state, and the attorney general, did approve the depository bond of the Capital National Bank in the penal sum of $700,000, upon which Charles W. Mosher and R. C. Outcalt were sureties; that the three certificates of deposits described in plaintiff's reply were indorsed by J. E. Hill as treasurer to his successor and by him on January 16, 1893, were surrendered to said bank, being indorsed to its president, C. W. Mosher, and in place of these certificates Treasurer Bartley with the amount thereof opened a current account with said bank and before January 21, 1893, had withdrawn therefrom $48,993.23, but that on the date last named said bank was not open for business and then was, and thenceforward has been, insolvent, and has dishonored certain checks drawn against said account after January 17, 1893, and that on January 22, 1893, said bank and its effects were taken possession of by a bank examiner and afterwards were, by such examiner, turned over to a receiver. It was further found by said special verdict that on May 11, 1893, J. S. Bartley, purporting to act as treasurer of the state of Nebraska, filed a claim with the said receiver for the unpaid balance of the above account, but that

said claim was afterwards returned to him without an allowance thereof being made, and that on September 4, 1895, Treasurer Bartley, by the attorney general of this state, brought suit in the circuit court of the United States for the district of Nebraska, against said receiver, to recover the amount of said balance. The defendants have moved for judgment upon this special verdict. To grant this motion would be to justify the verdict of the jury upon grounds radically different from those chosen by the state, consistently with which grounds the jury were instructed. As we are of the opinion that the motion for a new trial must be overruled, for the reason that there has been suggested or discovered in the record no error prejudicial to plaintiff, it results that, upon the general verdict judgment must be rendered for the defendants. It is therefore deemed advisable to make no order upon the motion for judgment on the special verdict, lest hereafter it might be assumed that the questions thereby presented had been passed upon by this court, in advance of an existing necessity for such action. The motion for a new trial is overruled and it is ordered that judgment be rendered in favor of the defendants upon the general verdict.

NORVAL, J.

This is an original action brought in this court by the state upon the official bond of John E. Hill as state treasurer for his second term of office. There have been two trials. At the first one the jury failed to agree. The second trial resulted in a general verdict for the defendants, and a special verdict was also returned under the directions of the court. A motion for a new trial has

been filed by the state, and a motion by the defendants for judgment upon the special verdict. These motions have been argued and submitted for our consideration.

Before taking up the questions presented by the foregoing motions I deem it proper to express an opinion upon several important propositions which were controverted, and ably argued by counsel during the trial.

Several defenses were interposed by the sureties in their answers, among others, that the bond sued on was never signed by Hill, the principal named therein; that the sureties signed the same upon the express condition that it should not be delivered until it had been signed by said Hill, and that if said instrument was ever delivered to, or filed with, the secretary of state, it was against the defendants' consent and in violation of the condition aforesaid. At both trials one of the objections to the introduction of the bond in evidence urged by the sureties was that the state had failed to show it was ever delivered by Hill to the secretary of state as and for the former's official bond, which objection was overruled. Considerable testimony was adduced for the purpose of establishing the delivery of the instrument, which I do not now deem important to review, or to express an opinion upon its sufficiency, inasmuch as the question of delivery was not an issuable fact in the case. The petition expressly alleges the delivery of the instrument to the proper officer of the state. In the third subdivision of each of the answers of the sureties I find the following language: "This defendant admits that he did sign the instrument in writing mentioned, and by copy attached to the petition,

and in the petition designated as the bond of office of the defendant Hill as treasurer of the plaintiff, but this defendant alleges the fact to be that at the time he signed said instrument it was expressly understood and agreed by and between this defendant and the said defendant Hill, and between defendant and others who had signed and who were to sign said instrument, that said Hill should and would, before said instrument should be delivered or be presented to the governor of the state of Nebraska for approval, and before it should be filed or recorded, be signed by said defendant Hill; and this defendant signed said instrument upon the express condition that it should not be delivered until after it had been signed by said defendant Hill. Defendant further says that said Hill never at any time signed said instrument, and if it was ever delivered it was done in violation of the express condition aforesaid, upon which defendant signed said instrument." It is obvious, that, under the rules governing pleadings in the Code states, the foregoing was insufficient to put in issue the averment in the petition of the delivery of the bond in question. The answer states that "if it [the bond] was ever delivered, it was done in violation of the express conditions" under which it was signed. This averment constituted a substantial admission of the delivery of the bond to the proper officer, and the state was, therefore, not required to prove that fact. (*Dinsmore v. Stimbert*, 12 Neb., 433; *Miller v. Hurford*, 13 Neb., 22; *School District v. Holmes*, 16 Neb., 488; *Dwelling House Ins. Co. of Boston v. Brewster*, 43 Neb., 528.)

Another objection urged to the admission of the bond in evidence was that it was never signed
36

or executed by Treasurer Hill. This contention
is based upon the fact that Hill did not subscribe
his name to the bond at the usual place for sign-
ing below the body of the instrument, and pre-
ceding the signatures of the sureties. The ques-
tion was ably discussed at the bar and in the
briefs filed as to whether the sureties upon an
official bond are bound where the instrument has
not been executed by the principal named therein.
There is a sharp conflict in the authorities upon
this point. The following decisions lend support
to the doctrine that the sureties are liable, even
though the principal did not execute the bond:
*State v. Bowman*, 10 O., 445; *Trustees of Schools v.
Sheik*, 119 Ill., 579; *Loew's Administrator v. Stocker*,
68 Pa. St., 226; *Williams v. Marshall*, 42 Barb. [N.
Y.], 524; *Parker v. Bradley*, 2 Hill [N. Y.], 584;
*Scott v. Whipple*, 5 Greenl. [Me.], 336; *Keyser v.
Keen*, 17 Pa. St., 327; *Johnson v. Weatherwax*, 9
Kan., 75; *State v. Peck*, 53 Me., 284; *Tillson v. State*,
29 Kan., 452; *State v. Peyton*, 32 Mo. App., 522.
There are other cases which hold that such a bond
is imperfect and no action can be maintained
thereon against the sureties. (*Bean v. Parker*, 17
Mass., 603; *Russell v. Annable*, 109 Mass., 72; *Wood
v. Washburn*, 2 Pick. [Mass.], 24; *Goodyear Dental
Vulcanite Co. v. Bacon*, 151 Mass., 460; *People v.
Hartley*, 21 Cal., 585; *Bunn v. Jetmore*, 70 Mo., 228;
*Wells v. Dill*, 6 Martin [La.], 665; *Johnston v. Town-
ship of Kimball*, 39 Mich., 187; *Hall v. Parker*, 39
Mich., 287; *Sievers v. Woodburn Sarven Wheel Co.*,
43 Mich., 279; *Board of Education of Rapid City v.
Sweeney*, 48 N. W. Rep. [S. Dak.], 302; *City and
County of Sacramento v. Dunlap*, 14 Cal., 421;
*Fletcher v. Austin*, 11 Vt., 447; *State v. Austin*, 35
Minn., 51.) Our court, in *Gregory v. Cameron*, 7

Neb., 414, has held that a bond given to secure a stay of execution signed by the sureties alone is invalid, and in *Bollman v. Pasewalk*, 22 Neb., 761, an indemnifying bond signed by the sureties and not executed by the principal therein named, was sustained. Thus it will be seen that not only are the adjudications in other states hopelessly irreconcilable upon the point, but this court is apparently upon record on both sides of the question. As I view the case at bar, it is unnecessary that at this time we should determine which line of decisions lays down the true rule, inasmuch as the proofs adduced on the last trial show beyond controversy that Treasurer Hill did in fact execute the instrument declared upon as and for his official bond. In preparing the bond a printed form was used, the most of the blank spaces therein being filled in the handwriting of Mr. Hill. He wrote his own name three times in the body of the bond, besides inserting the amount of the penalty of the bond and the name of the office to which he had been elected, with the intention of making it his bond, and for the purpose of enabling him to qualify as state treasurer. Following the justification of the several sureties attached to the bond, is the following oath of office:

"STATE OF NEBRASKA, } ss.
  LANCASTER COUNTY. }

"I do solemnly swear that I will support the constitution of the United States, and the constitution of the state of Nebraska, and will *faithfully discharge the duties of state treasurer* of the state of Nebraska according to law, to the best of my ability; and that at the election at which I was chosen to fill said office I did not improperly influ-

ence in any way the vote of any elector, nor have I accepted, nor will I accept or receive, directly or indirectly, any money or other valuable thing from any corporation, company, or person, or any promise of office for any official act or influence.

"JOHN E. HILL.

"Subscribed in my presence and sworn to before me this 8th day of January, A. D. 1891.

"AMASA COBB,<br>"<i>Chief Justice.</i>"

It was shown that the signature "John E. Hill" appended to the oath and the words "faithfully discharge the duties of state treasurer," set out in the body thereof, were in Mr. Hill's handwriting; that he obtained the signatures of most of the sureties thereon; that the bond was presented to both Governors Thayer and Boyd, and was approved by each of them; that subsequently it was filed and recorded in the office of the secretary of state—the proper custodian thereof; that the failure of Mr. Hill to subscribe the bond at the usual place was a mere unintentional omission on his part; that he did not know of it until about the time this action was instituted, and that he entered upon and discharged the duties of his office for the full term in the belief that he had qualified as required by law. These facts, under the authorities, constitute a signing and execution of the bond by Hill, and the sureties are as firmly bound as though their principal had signed his name at the usual place at the bottom of the instrument. (<i>Gage County v. Fulton</i>, 16 Neb., 5; <i>Taylor v. Dobbins</i>, 1 Strange [Eng.], 399; <i>Schneider v. Norris</i>, 2 M. & S. [Eng.], 286; <i>Morison v. Turnour</i>, 18 Ves. Ch. [Eng.], 175; <i>Bleakley v. Smith</i>, 34 Eng. Ch., 150;

*Clason v. Bailey*, 14 Johns. [N. Y.], 484; *Penniman v. Hartshorn*, 13 Mass., 87; *Schmidt v. Schmaelter*, 45 Mo., 502; *Fulshear v. Randon*, 18 Tex., 275; *Wise v. Ray*, 3 Greene [Ia.], 430; *McConnell v. Brillhart*, 17 Ill., 359; *Barry v. Coombe*, 1 Pet. [U. S.], 640; *Palmer v. Grant*, 4 Conn., 389; *Quin v. Sterne*, 26 Ga., 223; *Drury v. Young*, 58 Md., 546; *Hall v. Lafayette County*, 69 Miss., 529; *McLeod v. State*, 69 Miss., 221.) The last two cases are directly in point. The last one was an action on the official bond of McLeod as sheriff and tax collector. The instrument was prepared by McLeod, he inserting his name in two places in the body thereof, and in that condition it was presented to, and signed by, the sureties, they leaving the first line at the end of the bond for McLeod's signature. Through inadvertence he failed to attach his signature there, and the bond was approved. McLeod took and subscribed the oath required, and thereafter entered upon the duties of his office. In an action upon the bond, the sureties attempted to show that they signed the instrument on the condition that the principal was also to sign it, but the trial court refused to allow such evidence to be given, and gave a peremptory instruction to find for the plaintiff, and a verdict was returned in accordance therewith. The judgment entered against McLeod and his sureties was affirmed by the supreme court. Cooper, J., in delivering the opinion of the court observes: "McLeod made the bond, and his name twice appeared in the body thereof, written by him. True, he says that he did not intend his name, as written, to be his final signature or subscription thereto; but he testifies that the bond, as it now appears, was delivered by him as his official bond, and accepted as such by the approv-

ing authorities. He intended the bond, as written
by him, to be operative; and when this appears,
and the name appears in the instrument, written
by the party, such signature, adopted by the final
delivery, intended as such, is such an authenti-
cating signature as discloses the purpose of the
obligor." The usual place for signatures to a
bond is at the bottom of the instrument, but its
validity does not necessarily depend on its being
signed there, as the authorities last above cited
show. The statute (sec. 8, ch. 10, Compiled Stat-
utes) relating to bonds of state officers does not
require such a bond to be subscribed by the prin-
cipal therein, but provides that it shall be exe-
cuted by him, with at least three sureties. It is
therefore of no consequence on what part of the
bond Hill wrote his name,—whether at the top, in
the body, or at the bottom,—so he placed his name
thereon with the intention of binding himself.
This we think he did, and therefore he duly signed
and executed the bond, as fully and completely as
if he had attached his signature at the bottom of
the instrument. The liability of the defendant
sureties is conditional to that of their principal.
He being bound, they are also bound. We so held
and instructed the jury upon the last trial.

Another defense interposed by the sureties was,
as already indicated, that they executed the bond
upon the condition that the principal should like-
wise sign it, and that they did not consent to its
delivery without it. Numerous authorities were
called to our attention which lay down the rule
that an official bond, signed by sureties alone,
whose signatures were secured upon the promise
of the officer that he would also execute the same
before delivery, and without their knowledge and

consent it was accepted and approved without the signature of the principal, is invalid and of no binding force whatever. Had it been established that Treasurer Hill never signed the bond under consideration, the decisions relied upon by the sureties would be in point. It is not alleged in the answers that Hill promised to subscribe the bond by writing his name at the usual place for signatures, but that he agreed to sign the instrument. Inasmuch as Hill did execute the bond, although he failed to sign it at the bottom, the defense interposed that the bond was delivered in violation of the condition pleaded has fallen to the ground.

The motion for a new trial contains several assignments, but they need not be stated, nor shall I discuss each assignment separately. I shall direct my attention alone to such questions as were argued upon the presentation of said motion and the motion of defendants for judgment upon the special verdict.

The petition alleges two breaches of the bond, the first being that the defendant Hill, during his second or last term of office, deposited of the moneys held by him and belonging to the state the sum of $285,357.85 in the Capital National Bank of Lincoln; that said sum had not been disbursed or paid out for the use and benefit of the state or in any manner accounted for, but so remained on deposit in said bank when he surrendered his office to his successor, and that he has failed and refused to pay over the amount thereof to such successor. For a second breach it is averred, in effect, that at the end of Hill's last term of office, in making settlement with Joseph S. Bartley, his successor in office, for the money

received and held by him as such state treasurer
and which then remained in his hands undis-
bursed, said Hill turned over to said Bartley, who
received and accepted in lieu of money certain
certificates of deposit issued by said Capital Na-
tional Bank amounting in the aggregate to the
sum of $285,357.85, of which amount said Bartley
has subsequently received upon said certificates
from said bank certain sums of money, aggregat-
ing the sum of $48,993.23 and no more, and that
said bank was, at the time said certificates were
turned over by Hill, and ever since has been,
wholly insolvent, and it has failed and refused to
pay any other sums of money upon said certifi-
cates of deposit, and that by reason of the prem-
ises aforesaid the conditions of said bond are
broken and the defendants became indebted to the
state in the difference between the amounts of
said certificates of deposit and the sums received
thereon by said Bartley, to-wit, $236,364.62, for
which amount, with interest thereon, judgment is
prayed. Although two breaches of the bond are
alleged, the action is to recover but a single sum,
namely, the amount last above stated.

It is conceded by the state that the defendant
Hill has fully accounted for all moneys which
came into his hands as state treasurer, save and
except the sum last aforesaid. It was also estab-
lished beyond controversy that only a small por-
tion of the revenues of the state was paid to Hill
in actual cash, but that almost the entire bulk
thereof was received by him in bank drafts,
checks, and certificates of deposit as for and in-
stead of money; that Hill, in settling with his suc-
cessor, delivered to the latter certificates of de-
posit and other choses in action of the same

character as those which Hill had accepted as treasurer; and that Hill has properly paid out and disbursed, or accounted to his successor in office for all sums received by him in his official capacity in actual cash, as well as for all drafts, checks, certificates of deposit, or other evidences of indebtedness received by him for the use of the state, which the proofs disclose he converted into money during his second term.

The following facts were established upon the trial by uncontradicted testimony, and the jury by their special verdict substantially so found: That J. S. Bartley, after his induction into office as state treasurer, received from the defendant Hill, as money, three certificates of deposit aggregating $285,357.85, issued by the Capital National Bank, each payable to the order of "State Treasurer of Nebraska," each of said certificates being indorsed "J. E. Hill, State Treasurer;" that subsequently on January 14, 1893, the Capital National Bank was duly made a state depository; that two days later said Bartley as state treasurer indorsed said certificates of deposit and delivered the same to said bank, and took credit for the aggregate amount of said certificates on open account with said bank in the name of "J. S. Bartley, Treasurer," which certificates were thereafter retained by said bank; that there were drawn by said Bartley, and paid by said bank, checks to the aggregate amount of $48,993.23, there being no deposit other than already stated; that on January 14, 1893, and thenceforth said bank was insolvent; that on the 21st of said month it ceased to do business, and a receiver was appointed; that nothing further, either by the state or said Bartley, has been realized from said deposit or account;

that on September 4, 1895, said Bartley, as state
treasurer, by the attorney general as his attorney,
brought suit in the circuit court of the United
States for the district of Nebraska against the
receiver of said bank for the recovery of said un-
paid balance. The state insists that the accept-
ance by Bartley from Hill, his predecessor in of-
fice, of the said certificates of deposit issued by
the Capital National Bank, aggregating the sum
of $285,357.85, did not constitute a payment so as
to release the outgoing treasurer; in other words,
that an outgoing officer can make payment to his
successor in nothing but money. This view was
adopted by the court upon the trial of the case,
and the jury were so instructed in the following
language:

"4. You are instructed that the payment of
money in the hands of a state or county treasurer,
at the termination of his office, to his successor,
can be effectuated only by the delivery of that
which by the law of the land is recognized as
money. The mere delivery of certificates of de-
posit issued by a bank, upon which no money is
realized, is not a payment."

The soundness of this rule is doubted by some
of my associates, but it is the doctrine expressly
held and applied in *Cedar County v. Jenal,* 14 Neb.,
254. That was an action upon the official bond of
Peter Jenal, late county treasurer, to recover
moneys which it was claimed he had failed to pay
at the expiration of his term to one Howard, his
successor. The amount sued for was by the an-
swer of the defendants admitted to have been in
Jenal's hands at the close of his term, the defense
being that he had paid the same to said Howard
by depositing the amount, under the express direc-

tions of said Howard, in the latter's name with
one Parmer, a banker, receiving therefor certifi-
cates of deposit, which Jenal delivered to and
which were accepted by said Howard as payment
of the amount found chargeable against the out-
going treasurer on settlement.  There was judg-
ment in the district court for Jenal and his sure-
ties, which was reversed by this court on the
ground alone that the facts above stated did not
constitute a payment.  In the opinion, which was
written by LAKE, C. J., it is said: "Is the matter
pleaded as payment a defense?  We think not.
The bond given by the defendant, on which the
action was brought, required Jenal to 'promptly
pay over to the person or officer entitled thereto,
all money' which might 'come into his hands by
virtue of his said office,' and to 'faithfully account
for all balances of money remaining in his hands
at the termination of his office.'  Section 94 of the
revenue act, General Statutes, 930, provides that
the 'treasurer, on going out of office, shall deliver
to his successor in office all public moneys,' etc.,
'in his possession.'  And the next section declares
that if he 'shall fail   *   *   *   to pay over all
moneys with which he may stand charged at the
time, and in the manner prescribed by law, it
shall be the duty of the county clerk, on receiving
instructions,   *   *   *   to cause suit to be insti-
tuted against such treasurer and his sureties, or
any of them, in the district court of his county.'
Thus we see that, it being money that was in
Jenal's hands, belonging to the county, both the
law and his official bond united in requiring him
to hand that over to his successor.  The delivery
of Parmer's certificates was not payment, for they
were mere promises of a stranger to the county

to pay money. The payment of money can be effectuated only by the delivery of that which by the law of the land is recognized as money. Even if Howard, the successor in office, did agree to accept these certificates in payment, which, however, he denies, no money having been realized from them, it could avail the defendants nothing as against the county. In the collection, care, and disbursement of the revenues in this state, such certificates are not recognized at all by the law, and no officer has any right whatever to deal in them on behalf of the public. If a treasurer invest the public funds in them, he is guilty of a highly penal offense. (Criminal Code, sec. 124.) It would indeed be a strange system of laws that would permit an act, denounced as a felony, to be pleaded in bar of an action brought to recover money lost by that act. But such is not the law. The only way in which it was possible for Jenal to have satisfied the law and his bond, and relieved himself and his sureties from responsibility as to this money, was to have handed it over to his successor in office. It being money which he held on the public account, it was money that the law and his bond required him to produce and hand over. Nothing else could suffice." The foregoing is clear cut. The language has no doubtful meaning, nor was this utterance of the court mere *obiter*. The question was squarely involved whether an outgoing treasurer can make payment to his successor in anything except money, and the court said, and rightly so, in my judgment, that he could not. To be sure, in that case it appears that Howard, who was Jenal's successor, denied that he agreed to accept the certificates as payment, but the verdict being for Jenal, we must

assume that the evidence was sufficient to establish, and the jury must have found, that Howard received the certificates in lieu of cash.   This decision has never been overruled, but was cited with approval in *Wayne County v. Bressler*, 32 Neb., 818; and was also cited in *State v. Hill*, 38 Neb., 698.   In the opinion in the last case, IRVINE, C., uses this language: "From the statutes already quoted and from the decisions of this court (*State v. Keim*, 8 Neb., 63; *First Nat. Bank of South Bend, Ind., v. Gandy*, 11 Neb., 431; *Cedar County v. Jenal*, 14 Neb., 254; *Wayne County v. Bressler*, 32 Neb., 818) it is clear that it is the duty of both state and county treasurers to keep the money coming into their official custody in specie, except where by recent statutes they are permitted to invest or deposit it, and then such investment or deposit must be made only in the manner provided by law. Hill's duty was to keep the money in the treasury at Lincoln.   He had no right to invest it in any manner, or to deposit it.   *   *   *   When Hill removed the money from the treasurer's office with the intent of depositing it contrary to law, he was guilty of a conversion and a cause of action accrued." If Hill could not lawfully, and without violating the conditions of his bond, deposit in bank the moneys belonging to the state, I do not understand by what process of reasoning it can be held where he has made such deposit of public funds and received a certificate of deposit as evidence thereof, and turned the same over to his successor in making settlement with him at the expiration of his term, that it would release the outgoing treasurer and his sureties to the extent of the amount of such certificate.

The decision of the *Jenal Case* was placed upon

two grounds: First—That the bond and the stat-
utes of the state alike required the treasurer to
make payment to his successor in money.   Sec-
ond—That under the Criminal Code it is a crime
for a treasurer to loan the public funds or to de-
posit the same in bank.  It may be that the last
ground is untenable, yet, nevertheless, the other
course of reasoning adopted by the author of the
opinion is not only sound, but unanswerable.  The
doctrine of the *Jenal Case* is neither new nor start-
ling.   It merely recognized and applied a familiar
principle of the law of agency to a public officer.
An agent cannot bind his principal by receiving
anything but money in discharge of a debt due
the principal, unless authorized by the latter so
to do.  An attorney cannot discharge a judgment
in favor of his client except by the payment of the
full amount thereof in money, unless empowered
to do otherwise, or there has been a subsequent
ratification.   Should he accept, in payment of a
judgment, a promissory note, the plaintiff would
not be bound.   In *Smith v. Jones*, 47 Neb., 110, this
court said: "The ordinary powers of an attorney
do not authorize him to execute any discharge of
a debtor but upon the actual payment of the full
amount of the debt, and that in money only;"
citing *Hamrick v. Combs*, 14 Neb., 381; *Stoll v. Shel-
don*, 13 Neb., 207; *State Bank of Nebraska v. Green*,
8 Neb., 297; *Luce v. Foster*, 42 Neb., 818.

As Bartley was merely the agent of the state,
he could not bind the public by accepting from his
predecessor, Hill, anything which by the law of
the land is not regarded as money.   Undoubtedly,
as between individuals, payment of a debt may be
made in any mode which the parties agree shall
be treated as the equivalent of a money payment.

In such a case it may be by anything of value which is delivered and accepted for the purpose of extinguishing the indebtedness. It may be made in property or in services, or by a certificate of deposit, if the parties so agree. This is, in effect, the holding in *Hughes v. Kellogg*, 3 Neb., 186; but that decision does not justify the conclusion that a public officer can make payment to his successor by delivery of certificates of deposit or anything else than money, so as to bind the public. If these certificates of deposit had been delivered by Hill to Bartley in satisfaction of an individual indebtedness of the former to the latter, then I agree this would have constituted a valid payment, and the case of *Hughes v. Kellogg, supra,* would be analogous. I suppose it will not be questioned by any one that had Bartley accepted as payment from Hill promissory notes of responsible third persons, or other choses in action, that such payment would have been ineffectual to release these defendants. If such be the law, and there can be no doubt of it, then logically it follows that the acceptance by Bartley of the certificates of deposit upon an insolvent bank did not bind the state,—at least no further than the same may have been by him converted into money,— since certificates of deposit, in form like those under consideration, are in substance and legal effect promissory notes. They are but the mere promises of the Capital National Bank to pay money. (*Bailey v. Bailey*, 25 Mich., 190; *Tripp v. Curtenius*, 36 Mich., 495; *Citizens Nat. Bank v. Brown*, 45 O. St., 39; *Howe v. Hartness*, 11 O. St., 449; *Welton v. Adams*, 4 Cal., 37; *Brummagim v. Tallant*, 29 Cal., 503; *Payne v. Gardiner*, 29 N. Y., 146; *Renfro Bros. v. Merchants & Mechanics Bank,*

83 Ala., 425; *Klauber v. Biggerstaff*, 47 Wis., 551; *Curran v. Witter*, 68 Wis., 16.)

In *Bank of Orange County v. Wakeman*, 1 Cow. [N. Y.], 46, it was held that an officer cannot lawfully receive a promissory note as payment.

In *Elliott v. Miller*, 8 Mich., 132, it was decided that a township treasurer has no right to receive in payment of taxes a draft or anything which the law has not authorized to be so received. To the same effect is *Jones v. Wright*, 34 Mich., 371.

It was ruled in *People v. McKinney*, 10 Mich., 54, that the reception by the state treasurer of drafts drawn by a railroad company on a New York bank in payment of taxes, did not amount to a payment any further than the money had been received by the treasurer upon such drafts.

Campbell, J., in his separate opinion in *City of Lansing v. Wood*, 57 Mich., 201, which was an action on the bond of Wood, the treasurer of the city of Lansing, for failure to pay over moneys received by him during his official term, in discussing whether the receipting for certificates of deposit as cash by the incoming treasurer from the outgoing one operated to bind the city, says: "Such a certificate is no payment unless received as such by one who has power to accept payment in that way. The question is not, perhaps, of any great importance, except in the one point of view urged on the argument that Wood had lawfully deposited his official moneys in Angell's bank, and by this process merely shifted the deposit to his successor, who thereby made the same bank his own place of deposit. No authority is found in our reports, and, so far as we have discovered, none exists anywhere, which favors the idea that a public treasurer may accept from a public

debtor payment in anything but money. If he takes anything else, he may make himself liable for any harm that may come from his doing so, but until the money is actually realized, the debtor has made no payment which will bind the creditor. If the money is realized the payment then becomes complete, but not otherwise."

We have carefully examined the opinion in *State v. McFetridge*, 84 Wis., 473. The sole question there before the court was whether a state treasurer and his sureties on his official bond were liable to the state for interest received by such officer for state funds deposited by him in bank. Such liability was held to exist. Whether an outgoing treasurer could bind the state by the delivery to his successor of certificates of deposit as and for money held by him by virtue of his office was neither involved nor decided in that case. In our investigation of the subject we have been unable to find a single authority, and none has been cited, which holds that the mere delivery and acceptance of certificates of deposit, upon which no money has been obtained, is such a payment as will discharge the outgoing officer.

The statute (sec. 2, art. 4, ch. 83, Compiled Statutes) provides that "it shall be the duty of the state treasurer: First—To receive and keep all moneys of the state not expressly required to be received and kept by some other person. Second—To disburse the public money upon warrants drawn upon the state treasury according to law and not otherwise. Third—To keep a just, true, and comprehensive account of all moneys received and disbursed. * * * Eighth—He shall account for and pay over all moneys received by him as such treasurer to his successor in

37

office." The foregoing statute defining the duties. of the state treasurer requires him to account for and pay over, on the expiration of his term, to his successor all moneys received by him belonging to the state. This he can alone do by delivering the amount in actual cash. In no other way can he satisfy the conditions of his bond to well and truly perform the duties of his office required by law. It is money that he is required to pay over. It is idle to say that a certificate of deposit is money. We know it is not. It is the mere promise of the person or bank issuing it to pay money either on demand or at a fixed time. It is absurd to say that a promise to pay money is money. No person is required to accept such paper in discharge of a debt, and yet it is insisted that the liability of an outgoing officer and his sureties is released by the delivery to and acceptance by his successor of certificates of deposit in settlement, and that the state, whether it will or not, is bound. To such doctrine I cannot yield assent. Both upon principle and authority, I am fully satisfied that prior to the taking effect of the legislative enactment providing for the depositing of state and county funds in banks, which law was not in force when Hill settled with Bartley, a turning over by a state treasurer to his successor as moneys received by him during his official term certificates of deposit issued by a bank, would not alone exonerate such outgoing officer and his sureties from liability.

It is argued that the rule in the *Jenal Case* cuts both ways; that is, if Hill is not entitled to credit for the certificates of deposit turned over at the end of his term to his successor, then he is only chargeable with the amount received in cash at

the commencement of, and the sums paid in money during such term, and is not liable as for money for the amounts of any drafts, checks, or certificates of deposits accepted by Hill as so much money due the state.  This view was presented to the jury by the sixth instruction.  But upon reflection and considerable examination of the subject, I am now convinced that while Hill had no right to receive anything but money in payment of a demand due to the state, yet having done so, it does not necessarily follow that he is not liable to the state.  Although Hill could not bind the state by accepting certificates of deposit or other choses in action in satisfaction of demands due the state, yet such payment could be subsequently ratified.  In case of such ratification the state is bound, and Hill and his sureties are likewise bound.  The state, by instituting this suit and charging Hill with the amounts received from all sources, whether payments were made in cash, or by certificates of deposit, or other evidences of indebtedness, ratified Hill's action, and by treating the acceptance by Hill of such certificates of deposit or other evidences of indebtedness as a payment, the state thereby lost its remedy against the party whose indebtedness was extinguished by the delivery to Hill of such certificates of deposit or other choses in action as payment, and Hill and his bondsmen are liable the same as if the actual cash had been received. (*Modisett v. Governor*, 2 Blackf. [Ind.], 135; *Armstrong v. Garrow*, 6 Cow. [N. Y.], 465; *Heald v. Bennett*, 1 Doug. [Mich.], 513; *Welch v. Frost*, 1 Mich., 30; *Jones v. Wright*, 34 Mich., 371.) The last case was a proceeding by *mandamus* to compel the respondent to pay certain school moneys which, as

township treasurer, he had collected and failed to pay over. One of the defenses was that the respondent had accepted various local orders instead of money in payment of the taxes levied for school purposes. The court held this defense unavailing. The second subdivision of the syllabus reads thus: "A township treasurer has no right to receive for school moneys anything which the law has not authorized to be so received, and if he chooses to do so and to receipt for the taxes, he must make good the amount." Although the state had the power to repudiate any payment made to Hill in anything other than money, it was not bound so to do, and there is no claim that it has repudiated any payment so made. It is equally clear that Hill and his sureties are estopped to repudiate any such payment.

The record discloses that of the moneys of the state in Treasurer Hill's hands at the beginning of his last term, the sum of $177,489.84 was to his credit upon open account in the Capital National Bank, and the further sum of $90,000 was represented by outstanding certificates of deposit issued by said bank and held by said Hill as state treasurer; that he deposited divers sums of money in said bank during his last term and took credit therefor on his open account, and checks for various sums were likewise drawn from time to time by Hill against said account, which were paid by the bank; that a portion of these credits was carried through Hill's second term and was merged into the certificates of deposit which were turned over by him to Bartley. The case was submitted to the jury upon the theory that defendants were only liable for the amount of money Hill received upon said certificates and open account during his

second term.   Upon this branch of the case the
jury were directed by the seventh instruction as
follows: "Should you find that there was any
agreement between Hill and the bank with re-
spect to the application of withdrawals by him,
such agreement is binding upon the parties to the
action.   If, however, no such understanding ex-
isted, it is the right of the defendant Hill to direct
the application to be made of such withdrawals,
and it is not within the power of the state to make
another or different application thereof."   The
rule deducible from the authorities in regard to
the application of payments may be summarized
as follows: A debtor paying money has the right
to direct its application, but if he fails to do so,
the creditor may make the application at any time
before suit is brought. (*Robinson v. Doolittle,* 12
Vt., 246; *Wendt v. Ross,* 33 Cal., 650; *McCune v.
Belt,* 45 Mo., 174; *United States v. Kirkpatrick,* 9
Wheat. [U. S.], 720.) It is equally well settled
that where payments are made on an open ac-
count, and no appropriation thereof has been
made by either party before a controversy has
arisen concerning them, the law will apply them
in discharge of the earliest items. (*Lazarus v.
Friedheim,* 11 S. W. Rep. [Ark.], 518; *Pierce v.
Knight,* 31 Vt., 701; *Milliken v. Tufts,* 31 Me., 497;
*Wendt v. Ross,* 33 Cal., 650; *Thurlow v. Gilmore,* 40
Me., 378; *Harrison v. Johnston,* 27 Ala., 445; *Her-
sey v. Bennett,* 9 N. W. Rep. [Minn.], 590; *United
States v. Kirkpatrick,* 9 Wheat. [U. S.], 720; *Jones
v. United States,* 7 How. [U. S.], 684.) In the last
case the rule was applied to a running account
between the United States and a postmaster.   In
*United States v. Kirkpatrick, supra,* Judge Story in
delivering the opinion of the court said: "The

general doctrine is that the debtor has a right, if he pleases, to make the appropriation of payments; if he omits it, the creditor may make it; if both omit it, the law will apply the payments according to its own notions of justice. It is certainly too late for either party to claim a right to make an appropriation, after the controversy has arisen, and *a fortiori* at the time of the trial. In cases like the present, of long and running accounts, where debits and credits are perpetually occurring, and no balances are otherwise adjudged than for the mere purpose of making rests, we are of opinion that payments ought to be applied to extinguish the debts according to the priority of time; so that the credits are to be deemed payments *pro tanto* of the debts antecedently due." The rule respecting the appropriation of payments which was given in the case at bar I am constrained to hold was erroneous; but the verdict should not be set aside for error in this or any other instruction given to the jury, inasmuch as the verdict is the only one which should have been returned under the evidence, as I shall hereafter show. (*Converse v. Meyer*, 14 Neb., 190; *Knowlton v. Mandeville*, 20 Neb., 59; *Western Union Telegraph Co. v. Lowrey*, 32 Neb., 732.)

It remains to be determined whether the facts found by the special verdict, standing alone, or when taken in connection with the other facts, established by uncontradicted proofs, constitute a defense to the action. It is strenuously insisted that the surrender by Bartley of the certificates of deposit which he received from Hill to the Capital National Bank—the institution which had issued them—after it had become a state depository, and taking credit therefor on open ac-

count as state treasurer, amounted to a novation and operated as a release of the defendants from liability on their bond. I shall not at this time stop to discuss this line of defense. I am convinced that upon another ground the action must fail. While Bartley had no power to bind the state by accepting these certificates of deposit as payment, yet his action in that regard was subsequently ratified by the state. It is disclosed by this record that after the deposit of said certificates of deposit in the Capital National Bank to the credit of Bartley, as state treasurer, he drew checks against said account aggregating $48,-993.23, which were paid by said bank before its doors were closed. The state in its petition herein gave Hill credit for the same. Furthermore, the legislature, at its last session, in the act making appropriation for the current expenses of the state government for the ensuing years, and to pay the miscellaneous items of indebtedness of the state, made the following appropriation: "For state sinking fund, one hundred eighty thousand and one hundred and one and seventy-five one hundredths ($180,101.75) dollars, to reimburse said fund for the same amount *tied up in Capital National Bank.*" (Session Laws, 1895, p. 404, ch. 88.) Subsequently, Bartley, as state treasurer, by the attorney general as his attorney, brought suit against the receiver of said bank to recover the unpaid balance of said account. I am convinced upon full consideration of these matters that the state has ratified the act of Bartley in accepting said certificates of deposit from Hill as money, and thereby exonerated him from liability upon his bond. The only funds in the Capital National Bank which the state had, or could claim to have,

any interest in, it was shown were those arising from the deposit of the certificates received from Hill. The legislature must have regarded this claim against the bank as belonging to the state, else it would not, in making the appropriation aforesaid to reimburse the sinking fund, which had become impaired by the failure of the bank, have used the words, "amount tied up in the Capital National Bank." Had the law-makers desired to repudiate the act of Hill in delivering to his successor said certificates as money, in making said appropriation, it is reasonable to suppose they would have stated in the act the impairment of the sinking fund was occasioned by the money belonging thereto being "tied up in Hill's hands," or used some other appropriate designation. There is no room to doubt that the legislature was clothed with ample power to ratify the act of Bartley in receiving the certificates of deposit in settlement with Hill. (See *City of Lansing v. Wood*, 57 Mich., 201; *Board of Education v. McLandsborough*, 36 O. St., 227; *Mount v. State*, 90 Ind., 29; *Jewell Nursery Co. v. State*, 56 N. W. Rep. [S. Dak.], 113.) In the last case it was decided that there was a ratification, notwithstanding the governor vetoed the act passed by the legislature relied upon to show such ratification; and in the Michigan case it was held competent to show, in an action upon the bond of a city treasurer, that the city council had ratified and approved the act of the treasurer in turning over to his successor, in lieu of money, certain certificates of deposit issued by a bank that afterward failed. For the reason given, the motion for a new trial should be overruled and judgment rendered for the defendants.

POST, C. J.

I quite agree with my Brother RYAN that the motion for a new trial should be denied, but without dissenting from the views expressed by him, I prefer to rest my conclusions upon other and, as appears to me, more substantial grounds.  I was at the inception of this controversy, in common with my associates, firmly committed to the doctrine that Hill could discharge the obligations of his bond, as state treasurer, only by the actual payment to his successor, in cash, of the full amount with which he was in law chargeable at the close of his second term.  However, the investigation incident to two trials of the cause has led to the conviction that that doctrine is wholly indefensible.

There are certain facts clearly established by the proofs, and as to which there is no controversy, viz., that Hill, at the close of his second term, tendered to his successor, Bartley, as representing the funds with which he was chargeable, certain certificates of deposit, including three certificates issued by the Capital National Bank of Lincoln amounting in the aggregate to $285,-357.85; that Bartley, not being satisfied regarding value of the certificates so tendered, a committee of bankers was mutually chosen to pass upon the solvency of the several banks by which they were payable; that upon the recommendation of said committee certain certificates were rejected and the others, including those of the Capital National Bank above mentioned, were by Bartley accepted as payment of the full amount of their face value.  The result of that transaction was, I conceive, to render Bartley liable abso-

lutely upon his bond for the amount of money represented by the certificates of deposit so accepted by him, as effectually for all purposes as if he instead thereof had demanded and received from his predecessor legal tender currency or gold coin of the United States. It follows, as the result of that conclusion, that the receipt by Bartley of said certificates operated as a discharge *pro tanto* of the liability of Hill, which is in nowise affected by the subsequent failure of the Capital National Bank after being charged with the amount of such certificates as a state depository in accordance with the act of 1891. We can imagine cases in which the state, or other public body, may, by the proper action, pursue two successive treasurers individually in order to enforce a common liability, although it does not follow that it may have concurrent remedies upon the bonds of successive officers for the same cause of action. Indeed, the converse of that proposition appears to be too clear for argument, for whatever is by law recognized as a sufficient payment of public funds, by an officer to his successor, so as to charge the latter upon his official bond, will *per se* operate to discharge the former. I must not, however, be understood as holding that the power of an officer to bind his sureties or the public, in receipting for public moneys, is without limitation.

It is conceded, by way of illustration, that by no mere barter between Hill and Bartley could the latter have charged his sureties as for money received, or the former have relieved himself from liability upon his bond. Such a transaction is confessedly *ultra vires* and ineffectual for the purpose of concluding either the state or the sureties of an incoming treasurer; but in the absence of

statutory restrictions upon the subject, the system employed in the monetary transactions of the world, by which payments are made, and charges and credits adjusted through the agency of checks, drafts, and certificates of deposit, is so far applicable to custodians of public money as to render them liable for remittances thus in good faith made and received, provided such instruments be, as in this instance, accepted in payment, and not for collection and credit at the debtor's risk; and it can, on principle, make no difference in the application of that rule whether such payment be made by the owner of property for taxes assessed against him, or by a treasurer to his successor of the balance on hand at the close of his term of office. Lest my position may possibly be misunderstood, I repeat that Bartley, having accepted as money the certificates of deposit, is chargeable therewith as money. And the payment thus made being in accordance with the means generally, if not, indeed, necessarily, employed for the transfer of large balances, is within the scope of the authority of Hill and Bartley in their capacities as retiring and incoming treasurers, and therefore conclusive upon the state to the extent that its remedy is upon the bond of the latter for the funds so transferred. These views are not, I am aware, in accordance with certain expressions of opinion by this court, and for that reason an examination of the cases bearing upon the subject is appropriate in this connection.

*State v. Keim*, 8 Neb., 63, was an action below to recover the sum of $2,000 deposited by the state treasurer for safe-keeping with the defendants, who were doing business as private bankers. It was held on demurrer to the petition, and also on

review by this court, that the depositing in bank of state funds is in contemplation of law a loan thereof within the meaning of section 124 of the Criminal Code, that such a transaction is wholly unauthorized by statute and contrary to the spirit and policy of our laws, and cannot be made the basis of an action by the state in the absence of an express ratification by the legislature. The statutory provision above referred to, so far as material to the present inquiry, is as follows: "If any officer or other person charged with the collection, receipt, safe-keeping, transfer, or disbursement of the public money, or any part thereof, belonging to the state or to any county, or precinct, organized city or village, or school district in this state, shall convert to his own use, or to the use of any other person or persons, body corporate, association, or party whatever, in any way whatever, or shall use by way of investment in any kind of security, stock, loan, property, land, or merchandise, or in any other manner or form whatever, or shall loan, with or without interest, to any company, corporation, association, or individual, any portion of the public money, or any other funds, property, bonds, securities, assets, or effects of any kind, received, controlled, or held by him for safe-keeping, transfer, or disbursement, or in any other way or manner, or for any other purpose; or, if any person shall advise, aid, or in any manner participate in such act, every such act shall be deemed and held in law to be an embezzlement of so much of the said moneys or other property, as aforesaid, and shall thus be converted, used, invested, loaned, or paid out as aforesaid; which is hereby declared to be a high crime, and such officer or person or persons shall

be imprisoned in the penitentiary, not less than one year nor more than twenty-one years, according to the magnitude of the embezzlement, and, also, pay a fine equal to double the amount of money or other property so embezzled as aforesaid, which fine shall operate as a judgment at law on all of the estate of the party so convicted and sentenced, and shall be enforced to collection by execution or other process, for the use only of the party or parties whose money or other funds, property, bonds or securities, assets, or effects of any kind as aforesaid, has been so embezzled." (Criminal Code, sec. 124.)

*First Nat. Bank of South Bend, Ind., v. Gandy,* 11 Neb., 431, is an exaggerated statement of the same proposition, since it is there held, following *State v. Keim,* that funds of the county deposited in bank for safe-keeping by the defendant to his account, as treasurer, could by means of garnishee process be appropriated in satisfaction of a judgment against him individually. The following extract from the opinion in that case serves to illustrate the process of reasoning which led to the conclusion stated: "It does not lie in the mouth of Mr. Gandy or any of his privies, of which the Farmers & Merchants Bank is one, in respect to these funds, to deny that they are the private money of Mr. Gandy, which alone he had a right to deposit in bank, and the bank had a right to receive from him on deposit."

*Cedar County v. Jenal,* 14 Neb., 254, was an action on the bond of a county treasurer, the defense relied upon being the transfer by the defendant to the account of Howard, his successor, of certain funds of the county, then on deposit in bank, and the delivery to the latter of certificates of deposit

therefor.   It is noticeable that *State v. Keim* and
*First Nat. Bank of South Bend, Ind., v. Gandy*, al-
though not mentioned by the court, are cited as
authority by counsel for the county, and appear
to have had a controlling influence in the decision,
judging from the following language of Lake,
C. J.: "In the collection, care, and disbursement
of the revenues in this state, such certificates are
not recognized at all by the law, and no officer has
any right whatever to deal in them on behalf of
the public.   If a treasurer invest the public funds
in them, he is guilty of a highly penal offense.
(Criminal Code, sec. 124.)  It would indeed be a
strange system of laws that would permit an act
denounced as a felony, to be pleaded in bar of an
action brought to recover money lost by that act.
But such is not the law.   The only way in which
it was possible for Jenal to have satisfied the law
and his bond, and relieved himself and his sure-
ties from responsibility as to this money, was to
have handed it over to his successor in office.   It
being money which he held on the public account,
it was money that the law and his bond required
him to produce and hand over.   Nothing else
could suffice."

*Wayne County v. Bressler*, 32 Neb., 818, was an
action against a treasurer individually, and not
upon his bond, for the recovery of profits realized
from the use by him in his private business of the
funds of the county.   It was held on the authority
of the prior cases above cited that the action
would not lie.

In *State v. Hill*, 38 Neb., 698, which was an ac-
tion upon the bond involved in this cause, it was
said: "It is the duty of both state and county
treasurers to keep the money coming into their

official custody in specie, except where by recent statutes they are permitted to invest or deposit it.  *  *  *  Hill's duty was to keep the money in the treasury at Lincoln.  *  *  *  When he, Hill, removed the money from the treasurer's office with the intention of depositing it contrary to law, he was guilty of a conversion and a cause of action accrued."

It does not require a critical examination to perceive that subsequent cases, so far as they sustain the contention of the plaintiff in the present controversy, all depend for their authority upon *State v. Keim;* but that case, although in this state accepted as an authoritative statement of the law, appears, from a more careful analysis, to rest upon premises wholly false, while the doctrine therein asserted has been, by a verdict practically unanimous, rejected in other jurisdictions. Reduced to the form of a syllogism, the reasoning there employed may be thus stated: Public money unlawfully loaned by an officer charged with its collection or safe-keeping cannot, in the absence of an express ratification, be followed and recovered by the state, county, or other public body. The deposit in bank for safe-keeping, by an officer, of public money in his official custody, is a loan thereof within the meaning of the Criminal Code. Therefore public money cannot be recovered in an action against the bank in which it is deposited for safe-keeping without an express ratification of such unlawful loan. The subject might in view of the obvious fallacy of that argument be dismissed without further comment, but in view of the importance of the controversy and the gravity of the question involved, a reference to a few of the many authorities in conflict with the utter-

ances of this court will be here indulged. Mr. Mechem, in a note to section 922 of his valuable work on Public Officers, after a careful review of the authorities, intimates that *State v. Keim* stands alone in denying to the state the right to recover upon the facts reported, and adds that it "is not consistent with reason or authority if it was intended to hold that the state could not recover the money at all." And in *Wolffe v. State*, 79 Ala., 201, Chief Justice Stone, in criticising that' case, declares that it ignores "the principle that an outsider, by aiding in the misapplication of trust funds, knowing them to be such, constitutes himself a trustee and must account as a trustee."

*San Diego County v. California Nat. Bank*, 52 Fed. Rep., 59, arose out of a state of facts quite similar to *First Nat. Bank of South Bend, Ind., v. Gandy, supra.* There one D. made a deposit of money to his account as county treasurer, there being no agreement that the identical money should be returned, and it was in fact mingled with the funds of the bank. It was held, in an elaborate opinion by Judge Ross, that the county could recover on the ground that the bank was a mere trustee and was liable as such; and the principle there stated was distinctly recognized by this court in the recent case of *Cady v. South Omaha Nat. Bank*, 46 Neb., 756, holding that trust funds do not lose their character as such by being deposited in bank to the trustee's own account, but may be followed through any number of transformations and reclaimed by the owner so long as they can be distinguished in the hands of the trustee or his assignees.

So much for the major premise of that argument. Let us now determine whether there ex-

ists for the minor premise a more substantial
foundation; or, in other words, was the deposit
by Hill of the state's funds for safe-keeping in the
Capital National Bank a loan thereof within the
denunciation of the Criminal Code? By section
18, chapter 4, Revised Statutes, 1866, the duties of
the territorial treasurer were defined as follows:
"First—To receive and keep all moneys of the ter-
ritory not expressly required to be received and
kept by some other person.   Second—To disburse
the public money upon warrants drawn upon the
territorial treasury according to law, and not
otherwise.   Third—To keep a just, true, and com-
prehensive account of all moneys received and
disbursed.   *   *   *   Sixth—To render a full
statement to the auditor of all moneys received
by him, from whatever source; if on account of
revenue, for what years; of all penalties and in-
terest on delinquent taxes reported to or ac-
counted for to him, and of all disbursements of
public funds; with a list in numerical order of all
warrants redeemed, the name of the payee,
amount, interest, and total amount allowed
thereon; with the amount of the balance of the
several funds unexpended; which statement shall
be made on the first day of December, March,
June, and September, and oftener if required.
*   *   *   Ninth—He shall account for, and pay
over, all moneys received by him as such treas-
urer, to his successor in office, and deliver all
books, vouchers, and effects of office to him, and
such successor shall receipt therefor." (Revised
Statutes, 1866, p. 24, ch. 4, sec. 18.) These pro-
visions, amended by the insertion of the word
"state" instead of "territory," have been contin-
ued in force to this date (see sec. 2, art. 4, ch. 83,
    38

Compiled Statutes) and were, previous to the act of 1891, the only express provisions governing the keeping and accounting for of state funds aside from that contained in section 21, chapter 10, Compiled Statutes, viz.: "Any officer or other person who is intrusted with funds belonging to the state or any county thereof, which may come into his possession by any appropriation or otherwise, shall be responsible for the same upon his bond," etc. It is not claimed that these provisions even impliedly prohibit the depositing for safe-keeping of the state's money, and it was not claimed at the trial, and could not have been under the issues, that the deposit was made for any other purpose; and it is for that purpose wholly immaterial whether Hill in the transaction in question acted in the capacity of a trustee so that the legal title to the money deposited remained in the state, or whether his relation to the state was that of a debtor only, since in either case his liability is measured by the conditions of his bond.

This conclusion leads naturally to the next and most important subject of inquiry, viz., the extent to which, if at all, the discretion of public officers in the preservation of money entrusted to them for safe-keeping is restricted or controlled by the prohibition of the Criminal Code above set out. That provision is found in chapter 16 of the act which took effect September 1, 1873, entitled "An act to establish a Criminal Code." (General Statutes, 1873, p. 719, ch. 58.) The power of the legislature under a title like the above, to create new and distinct offenses, is not doubted. It is also true, as claimed, that where the law denounces as criminal an act,—particularly one which is contrary to public policy, or, as said in *State v. Keim,*

against the spirit and policy of our government,—. it will be regarded as if expressly prohibited and cannot be made the basis of an action at law or in equity; but the application of such a provision, like other acts of the legislature, is always a subject for judicial construction.    The evident design of the section under consideration was to prevent the use by the class of officers therein mentioned of the public funds for the purpose of speculation, and not as an amendment of existing laws pertaining to the manner in which such funds were required to be kept and accounted for.    It is true that the general deposit of money in bank is, for some purposes, regarded as a loan, since the relation thereby created is that of debtor and creditor; but that the word "loan" has any such comprehensive meaning in the connection in which. it is employed in the Criminal Code, I cannot admit.    In my judgment the expression "or shall. loan, with or without interest, to any company, corporation, association, or individual, any portion of the public money" (Criminal Code, sec. 124), applies to and includes those cases only in which the conventional relation of borrower and lender exists, and can have no reference whatever to a deposit made solely for the purpose of preserving such funds.    Before examining that subject in the light of authority, let us see what are the facts disclosed by this record.    Practically the only evidence of Hill's purpose, or of the conditions upon which the money was deposited in this instance, is found in the certificates of deposit issued by the bank, which are identical in form, except as to amounts, and of which one is here. set out:

"CAPITAL NATIONAL BANK.     $35,357.85.

LINCOLN, NEB., Jany. 6, 1893.

"State Treasurer of Nebraska has deposited in this bank thirty-five thousand three hundred fifty-seven 85-100 dollars, payable to the order of himself on return of this certificate, properly indorsed. Not subject to check.

"C. W. MOSHER, *President.*"

*Law's Estate*, 144 Pa. St., 499, was a proceeding to surcharge the account of a guardian to the amount of certain funds of the ward lost by reason of the failure of a bank, and turned upon the question whether the deposit thereof by the guardian amounted to a loan or investment of such funds. In the opinion of the court, which contains a review of the cases in that state, we observe the following language: "Was this transaction with the Bank of America a deposit of the money, or was it a loan or investment of it? A deposit is where a sum of money is left with a bank for safe-keeping, subject to order, and payable, not in the specific money deposited, but in an equal sum. It may or may not bear interest, according to the agreement. Whilst the relation between the depositor and his banker is that of debtor or creditor simply, the transaction cannot in any proper sense be regarded as a loan, unless the money is left, not for safe-keeping, but for a fixed period at interest, in which case the transaction assumes all the characteristics of a loan. * * * In the present case the money was placed in the bank, not as an investment for any fixed period, but merely for safe-keeping, and at a small rate of interest until a suitable investment could be found. * * * It is true that two weeks' notice was to be given of the

withdrawal of the deposit, but this was a reasonable provision and not inconsistent with a bank deposit.   *   *   *   A deposit, as we have said, is a temporary disposition of money for safe-keeping, and it is upon this ground alone that the trustee is justified in depositing trust funds in bank, and it is upon the same ground that a deposit is distinguishable from an investment." And the right to deposit trust money, as such, in bank while awaiting an opportunity for investment, or when from the necessities of the case such deposit is required in order to preserve it, is generally, if not universally, recognized. (*Churchill v. Hobson*, 1 P. Wms. [Eng.], 241; *Adams v. Claxton*, 6 Ves., Jr. [Eng.], 226; *Fenwick v. Clarke*, 31 L.J.Ch.,n.s. [Eng.], 728; *Wilks v. Groom*, 3 Drew [Eng.], 584; *Norwood v. Harness*, 98 Ind., 134; *McCabe v. Fowler*, 84 N. Y., 314; *In re Hunt*, 141 Mass., 515; 1 Lewin, Trusts, *295, 296; note to *Brice v. Stokes*, 2 White & T. L. Cas. [Eng.], 987.)

The question here involved was presented in *State v. McFetridge*, 84 Wis., 473, in the construction of a statute authorizing the investment by the treasurer of certain public funds with the consent of the governor, and of other funds by the commissioner of public lands, and expressly prohibiting the investment of any state funds except as therein provided. It was contended that the deposit by the treasurer of state funds in bank, without the consent of either of the officers above named, was an investment thereof within the meaning of the statute and accordingly unlawful; but the court, by Lyon, C. J., in disposing of that contention, say: "The distinction between a general deposit of money in a bank payable at any time on demand, and an invest-

ment of such money, is plain and substantial.
By such deposit the depositor does not lose con-
trol of the money, but may reclaim it at any time.
True, he loses control of the specific coin or cur-
rency deposited, but not of an equal amount of
coin or currency having the same qualities and
value," and after remarking that the treasurer
by an investment under the statute loses control
over the funds the learned. judge continues:
"The retention by the treasurer of substantial
control over the funds in the one case, and his
loss of such control in the other, mark the lead-
ing distinction between a mere deposit of the
funds and an investment thereof, as those terms
are used in the statutes."

By reference to the foregoing certificate of de-
posit it will be perceived that the transaction
here involved differs from an ordinary general
deposit in one respect only, viz., that the money
of the state in the Capital National Bank was
payable upon the return of the certificates, and
not subject to check. It is therefore directly
within the reasoning of the cases cited. But
the legislature could not, by the adoption of
the Criminal Code, have intended to require the
impounding of public funds in specie in the
vaults of the treasury for another and sufficient
reason, viz., that the state had then, as it has
now, no sufficient vault in which to securely keep
them. We take notice, too, for it is a matter of
common notoriety that treasurers have never kept
the funds of the state in actual cash in the vaults
of the treasury, and we may safely assume that
they will never be so kept, since no treasurer
could give the required bond who was suspected
of an intention to entrust the millions for which

he is accountable to the utterly insufficient security provided therefor by the state. A change so radical as to amount almost to a revolution of the financial policy of the state and which must result in multiplied embarrassments, owing to the inadequate provisions for investment of our rapidly increasing school fund, should not be sanctioned upon any such doubtful ground as an amendment of the Criminal Code, designed to prevent the embezzlement, by officers, of public funds entrusted to them for safe-keeping.

It was said by this court in *Chaplin v. Lee*, 18 Neb., 440, that to constitute embezzlement (in that case of public funds), it is essential that the owner be deprived of the property mentioned, by an adverse use or holding. According to the settled rule of construction, like terms in penal statutes are presumed to have been used according to their ascertained sense and meaning. (Endlich, Interpretation of Statutes, sec. 75.) And the doctrine that an act of a public officer, not expressly prohibited or contrary to public policy done in good faith to enable him to execute his trust, by preserving the funds committed to his custody, is punishable as an embezzlement in this state is, it would seem, the *reductio ad absurdum* of the rule heretofore asserted.

Although this opinion has been protracted much beyond the limit intended, I cannot dismiss the subject without a further reference to *State v. McFetridge, supra*. It was by statute of Wisconsin in one section made the duty of the state treasurer, under a severe penalty, to pay out, or deliver to persons entitled thereto, the same identical coin and currency paid into the treasury, and by another section, to keep such coin and

currency in the vaults of the treasury until law-
fully paid out.   By a third section it was made
the duty of the governor and attorney general,
at least once in each quarter, to examine and see
that all money shown by the treasurer's books to
belong to the state was in the vaults of the
treasury, and in case of deficiency, to require the
treasurer to immediately supply the amount
thereof.   The chief justice, after holding that the
section first above mentioned was designed, when
adopted in 1858, to prevent the payment of state
debts in depreciated money, concludes as follows:
"The better view is, we think, that if the public
creditors receive directly from the hands of the
treasurer or from banks, on the treasurer's draft,
money having the same value and essential quali-
ties as that paid into the treasury, the treasurer
does pay out 'the same moneys received and held
by him by virtue of his office,' within the meaning
and intention of the statutes."   And referring to
the second section the same judge says: "It is ar-
gued that the term    *    *    *    'money,' as em-
ployed in the statute, means the actual coin and
currency of the country.   This construction is,
we think, too narrow, for it ignores the customary
and necessary processes universally employed in
the conduct of business affairs, and the methods
by which the business of the treasurer's office
has been conducted from its first organization.
*    *    *    The construction of section 159 con-
tended for would require the treasurer to demand
that the revenues of the state should be paid to
him in lawful money, that is, legal tender funds,
or else would compel him to collect such checks,
drafts, or certificates of deposit in lawful money,
and place the proceeds and other money thus

received by him in the vault in his office in order
to be prepared for the official inspection of the
governor and attorney general. It is impossible
to impute any such absurd intention to the leg-
islature. It may be conceded for the purposes
of the case that such restricted construction of
the statute in respect to what is meant by the
vaults of the treasury is the correct one, * * *
but we cannot agree that the word 'money' as
there employed means only the actual coin and
currency in circulation as money. Such a con-
struction would be extremely technical, and is,
we think, uncalled for. 'Money' is a generic term
and may mean not only legal tender coin and cur-
rency, but also any other circulating medium or
any instrument or token in general use in the
commercial world as the representatives of value.
It includes whatever is lawfully and actually
current in commercial transactions, as the equiv-
alent of legal tender coin and currency. * * *
Certificates of deposit or other vouchers for
money deposited in solvent banks, payable on de-
mand, are a most convenient medium of exchange
and are extensively used in commercial and finan-
cial transactions to represent the money thus de-
posited. * * * Hence the same are 'money'
within the meaning of section 159, and its re-
quirements in that behalf were complied with by
the treasurer if * * * [there is] found in the
'vaults of the treasury' the amounts called for by
the books of the secretary of state and treasurer,
although portions thereof were in such certifi-
cates or vouchers." Cooley, C. J., in discussing
the precise question here presented in *City of Lan-
sing v. Wood*, 57 Mich., 201, uses this language:
"If Wood had first drawn the money from the

bank, and Edmunds [his successor] had taken and
immediately deposited it, the latter unquestiona-
bly, if he had a right to the moneys, would have
taken upon himself all risks.   What difference it
can make that the parties did not count out the
money and then count it in again, I do not per-
ceive.   It is manifest that all parties at the time
understood that the fund had been transferred to
Edmunds, and it is certain that he had all the evi-
dences of right, and the complete and absolute
control."

The foregoing comprehensive definition of the
term "money" as there employed accords with
the views of other writers and appears to be al-
together reasonable. (*Vide* Webster's Dictionary;
Century Dictionary; *Paul v. Ball*, 31 Tex., 10; *Ken-
nedy v. Briere*, 45 Tex., 305; *Taylor v. Robinson*, 34
Fed. Rep., 678.)

It is necessary to here again briefly refer to
some of the cases of which mention has been made
from this court.   In *Cedar County v. Jenal* the de-
cision was apparently right upon the facts, there
being evidence tending to prove that the certifi-
cates of deposit there involved were accepted,
not as in this case, in payment, but for collection
as credit only, by Howard, the defendant's suc-
cessor in office.   In *State v. Hill* the controlling
question was whether the alleged breach of his
official bond, by the principal defendant, occurred
in Douglas county or Lancaster county, jurisdic-
tion being claimed in behalf of the district court
for the first named county, by reason of the de-
posit by Hill as treasurer of state funds, in cer-
tain banks in the city of Omaha.   The petition
distinctly charged a loan of the money so depos-
ited, and which allegation was for the purpose of

the objection to the jurisdiction of the court taken as true; and what was in fact decided is that Hill, in withdrawing state funds from the vaults of the treasury for the purpose of unlawfully loaning the same, as alleged, in the city of Omaha, was thereby, *eo instanti*, guilty of conversion, whether in the consummation of his purpose such funds were subsequently loaned in Douglas county or elsewhere.  The question here presented was not involved in that case, the language quoted therefrom in apparent conflict with the views here expressed being responsive to the arguments of counsel for the respective parties, and should, as evidently intended, be regarded as *obiter* only.

I fully appreciate the importance of the doctrine *stare decisis*, and with what reluctance courts consent to the reversal of rules established by repeated decisions, although confessedly erroneous, particularly such as have become rules of property.  In such cases, according to the dictates of common justice, they should be adhered to until changed by statute.  There are, it is true, to be found cases holding that the same principle is applicable to all statutory constructions, whether involving rules of property or mere questions of practice; but such a consecration of the doctrine of *stare decisis* is opposed to reason and the overwhelming weight of authority.  That rule, like all others, is not without its exceptions, and, in the absence of complications resulting from property rights, it is the undoubted privilege, if not indeed the duty, of courts to re-examine their decisions whenever satisfied that they are fundamentally wrong. Such decisions ought, in the language of Chan-

cellor Kent, "to be examined without fear and revised without reluctance, rather than to have the character of our law impaired, and the beauty and harmony of the system destroyed by the perpetuity of error." (1 Kent, Commentaries, *477; Black, Interpretation of Laws, 403, 404; Endlich, Interpretation of Statutes, sec. 363.) It is certainly not discrediting the wisdom of our predecessors to hold, as must eventually be done, that the doctrine running through the cases cited is unsound in principle and unjust alike to the state, to its servants, and to the public at large, for time and experience are, after all, the logic by which to judge rules of law as well as morals, and our fondest hope is that our work may, when tried by that infallible test, be found equal in point of merit to theirs.

To repeat, the motion for a new trial should be denied and the cases mentioned, so far as they conflict with the rules herein stated, should be overruled.

IRVINE, C.

In my opinion the verdict rendered is the only one which could properly be rendered under the evidence; and it is therefore unnecessary to consider whether or not the instructions given were in all respects technically correct. Brevity, in so far as the importance of the questions presented permits, is imperative, and I shall therefore, in stating my views, omit references to the numerous authorities which have been consulted upon the consideration of interlocutory applications, and during the two trials of the case; nor do I feel that I would be warranted in any very extended presentation of the reasons for my own conclusions.

The case of the state rests entirely on the generally accepted construction of the case of *Cedar County v. Jenal*, 14 Neb., 254. That doctrine is that it is the duty of treasurers to keep all funds committed to their custody in specie; and that their obligations can only be satisfied by the payment to their successors of all undisbursed funds by the delivery "of that which by the law of the land is recognized as money." The phrase quoted is certainly somewhat vague; but according to the state's construction thereof,—and this construction is warranted by the *Jenal Case*,—checks, certificates of deposit, and instruments of like character do not come within the requirement of the law, although the commercial world may regard them as so far partaking of the characteristics of money that their acceptance in lieu thereof may bind individuals in private transactions. It is to my mind somewhat doubtful whether the present case presents a state of facts similar to those before the court in the *Jenal Case*. In this case there is no doubt that Hill not only tendered to his successor certificates of deposit in lieu of money, but his successor actually accepted those representing the deposit in the Capital National Bank. Two certificates of other banks he refused to accept, whereupon Hill delivered money in lieu of them. In the *Jenal Case* the plea was that instead of delivering the money to his successor, Jenal paid it to a foreign banker at his successor's direction, and delivered certificates evidencing such payment to the successor; and that the successor had accepted such acts as payment to him. The report of the case discloses that the successor denied having agreed to accept the certificates. What the evidence was otherwise on this question

does not appear.  I would have no doubt that
nothing short of the actual acceptance of the cer-
tificates by the successor would operate as a dis-
charge.  Conceding, however, that this case does
fall within the principle of the *Jenal Case*, or
rather that the facts of the *Jenal Case* were broad
enough to render the doctrine there announced
direct authority as applied to this case, still I
think the state has entirely failed to prove the
breach of the bond alleged in its petition.  If a
treasurer is entitled to credit for disbursements
or the delivery to his successor only when "that
which by the law of the land is recognized as
money" has been disbursed or delivered, it would,
seem to follow necessarily that he is chargeable
as for money only when he has received "that
which by the law of the land is recognized as
money."  If Hill is not entitled to credit for the
certificates which Bartley accepted from him,
how can it be said that Bartley is chargeable
with those certificates as money, and how can
it be said that Hill is chargeable as for money
received with any paper or credits received at
the commencement of or during his term of office?
The evidence shows that but a very small portion
of the deposits made in the Capital National
Bank were of money, and there was drawn from
the bank in money and lawfully disbursed by
Hill more than the money deposits.  The bal-
ance remaining in the bank at the close of his
term was created solely by the deposit of instru-
ments which under the rule in the *Jenal Case* were
not money in Hill's hands.  If the *Jenal Case*
should be followed at all, it must be followed to
its full extent and be applied on one side of the
account as well as on the other; and this must be

true of the receipts and deposits made during Hill's term of office, as well as of the balance re- ceived by him from his predecessor. If the rule is to be so applied, not a dollar with which Hill is chargeable as for money was traced into the account, except as it was traced out again under circumstances entitling Hill to credit therefor. The question of the application of the payments by the bank is therefore entirely immaterial. So that I concur with Commissioner RYAN in his opinion that upon the state's own theory of the case it cannot complain of the verdict. On that theory it may be that a treasurer commits a breach of duty when he does not insist on having all payments made to him in money, and that it was a breach of the bond for Hill to receive from his predecessor and from debtors of the state dur- ing his term things other than money; but the state did not frame its petition on that theory. It charges no such breach. On the contrary, it charges Hill in express language with the receipt of all sums in money. But for my own part I would not be prepared to let the decision rest on so technical a view, especially as I entertain the doubt alluded to as to the real extent of the doc- trine of the *Jenal Case;* and as I entertain a great deal more than a doubt as to the correctness of that doctrine if it goes to the extent which the state must claim for it in order to support its ac- tion. In other words, I believe that the incoming treasurer represented the state in accounting with his predecessor; and if he received, as the evi- dence shows he did, these certificates in satisfac- tion of so much of the state's claim against Hill, the state was bound by his action. If such action was improper and the state suffered a loss

thereby, the remedy would not be against Mr.
Hill. Hill parted with the certificates on the
faith of his successor's accepting them. He lost
their possession. He lost their legal title. In
the week or more which elapsed between the de-
livery of the certificates to Mr. Bartley and the
failure of the bank, Hill had no control over the
deposit, and was utterly powerless by any act of
his to obtain payment from the bank and defeat
the loss. The state had provided no means
whereby the treasurer could safely keep in specie
the moneys of the state. Indeed, it has become
impossible for the state to conduct its business
transactions by barbarous or mediæval methods.
Its business is too vast and too much interwoven
with the private business of its citizens to permit
it to entirely ignore the universal usages of com-
merce. Whether it will or not, it is forced to
more or less adapt itself to these usages. I think
our statutes relating to the business operations of
the state should be construed as having been
adopted with reference to the prevailing commer-
cial customs; and the proposition that Hill and
his bondsmen should be held liable for the loss in
this case, under all its circumstances, must ap-
pear to any man at all versed in commercial or
financial transactions as harsh, unreasonable, and
unjust.

I think there is another reason why this verdict
should not be set aside, which is perfectly con-
clusive. What is known as the depository law
went into effect at the expiration of Hill's term,—
that is, not later than January 14, 1893. Under
this statute, banks may present their bonds to the
state for the security of state moneys deposited.
These bonds are submitted to a board consisting

of the governor, secretary of state, and attorney
general for approval.   Upon the approval of such
a bond the bank becomes a recognized state de-
pository.   The treasurer is not only permitted,
but he is required, to keep all the current funds in
his hands on deposit in these designated banks,
and he is subject to indictment and punishment
if he willfully fails to do so.   He is expressly by
the statute relieved from liability on account of
loss of money while so deposited.   This was the
law when Mr. Bartley's term of office began; and
on that day, January 14, 1893, the governor, secre-
tary of state, and attorney general approved such
a bond tendered by the Capital National Bank in
the sum of $700,000.   This must have been one of
the first, if not the very first, bonds approved;
and the treasurer was thereby authorized to de-
posit in the Capital National Bank $350,000.   It
is fair to presume that at that time the condition
of the treasury was such as technically to require
a deposit of that full amount.   On the 16th of
January Mr. Bartley indorsed the certificates of
deposit received from Hill and caused them to be
delivered to the bank, and opened a general ac-
count with the bank under the depository law,
receiving on behalf of the state credit thereon for
the amount of these certificates, which were re-
tained by the bank and canceled.   Between the
16th and the 21st of January about $49,000 was
withdrawn by check from this account.   There
can be no doubt that at that time Mr. Bartley was
authorized to deposit that amount of money in the
bank.   There can be little doubt that the law re-
quired him to do so.   Whether he was authorized
to receive credit in the bank by transfer from Hill
or not, he was authorized to receive a credit by

39

deposit thereafter. The state by this act became
the creditor of the bank to the amount of the cer-
tificates, and there can be no doubt that from the
moment that deposit was made all remedies upon
the certificates were lost. Neither Hill nor Bart-
ley had any longer any right thereto or interest
therein. There was a complete novation. The
bank discharged its liability to the holder of the
certificates by assuming with the consent of the
state an equivalent liability to the state. To this
position the state makes two answers. In the
first place it says that the depository law is uncon-
stitutional. In the second place it says that the
bank was at the time of the deposit insolvent;
that the certificates were worthless and therefore
did not operate as a valid deposit.

In answer to the first contention it may be said
that in *Hopkins v. Scott*, 38 Neb., 661, a number of
constitutional objections to the act were consid-
ered, and it was held that it was not bad for any
of the reasons then suggested. The state now
presents an additional objection arising out of
section 22, article 3, of the constitution, providing,
among other things, that "No money shall be
drawn from the treasury except in pursuance of
a specific appropriation made by law, and on the
presentation of a warrant issued by the auditor
thereon." It is argued that this law contemplates
the withdrawal of money without an appropria-
tion and without a warrant. The provision
quoted, however, manifestly applies to the ulti-
mate disbursement of moneys in payment of
claims against the state, and has no reference to
any provisions which the legislature might see fit
to make in regard to the custody or investment of
money while in the treasury awaiting disburse-
ment.

The second argument is not, in my opinion, sound. No question is presented of fraud on the part either of Mr. Hill or Mr. Bartley. It is not pretended that either knew the bank was insolvent. The state was willing that its money should be lent to the bank, and the state's officers had approved security offered by the bank as satisfactory. It must be admitted that had Bartley deposited money to the amount for which he obtained credit at the bank, such a deposit would have been lawful. If he had presented the certificates to the paying teller, had received payment thereof in money, and had immediately redeposited that money with the receiving teller, there could be no doubt of the validity of the deposit. I cannot see that the situation is changed because that process was not adopted. If A gives to B his check on a bank in payment of a debt, and B deposits the check in the bank on which it is drawn and receives credit on his own account for the amount of the check, the amount being at the same time charged to A by the bank, is not the debt from A to B satisfied, there being no fraud in the transaction, both men believing the bank good, even though it does afterwards develop that the bank was insolvent? In that case it was B who gave credit to the bank and who took the risk of its insolvency. He was willing to accept the bank as his debtor. The case is very different from that suggested in argument, of the deposit in one bank of a check drawn on another which fails before the check is collected. In the latter case the payee of the check has not accepted the bank on which it was drawn as his general debtor. The payment is in such case conditional at best. This case is precisely analogous to that first supposed;

and I think that whatever may have been the law before the depository act took effect, the state is now in the banking business and in its banking transactions acquires the same rights and subjects itself to the same liabilities as an individual. There is no possible doubt that the state for this money has a remedy upon the depository bond given by the bank. If the sureties on that bond were insufficient, the responsibility certainly does not rest upon Mr. Hill or his sureties.

On this aspect of the case I think the decision of the court and the reasoning of Judge LAKE in *Hughes v. Kellogg*, 3 Neb., 186, is directly in point and conclusive.

HARRISON, J.

I concur in the doctrine announced in paragraphs 11, 12, 16, and 18 of the syllabus to the opinion in this case written by Chief Justice POST, also in what is stated in paragraphs 2, 4, 7, 8, and 10 of the syllabus of the opinion written by NORVAL, J., of which I call attention to Nos. 7 and 8, stating:

"7. The legislature has the power to ratify the act of an outgoing state treasurer in turning over to his successor, as money, certificates of deposit issued by a bank.

"8. Held, that the record discloses such a ratification in this case."

I also agree with Commissioner IRVINE in the statement that "The deposit by Bartley, under the depository law, of the certificates received by him from Hill in the same bank which issued them, the cancellation of the certificates, and the state's accepting a credit on open account, operated a novation, made the bank the state's debtor, and

released Hill from liability;" and also agree with the conclusion of Commissioner RYAN, that under the issues presented in the cause there was sufficient evidence to sustain the verdict rendered, and it must therefore stand.

RAGAN, C.

I agree with the conclusion of RYAN, C., that the motion for a new trial must be overruled and judgment entered for the defendants.    I also concur in the views expressed by the chief justice, and entirely agree with IRVINE, C., that "The deposit by Bartley, under the depository law, of the certificates received by him from Hill, in the same bank which issued them, the cancellation of the certificates, and the state's accepting a credit on open account for their amount, operated a novation, made the bank the state's debtor, and released Hill from liability." I also concur in points 2, 4, and 10 of the syllabus of the opinion by NORVAL, J.